JAMES A. PADDOCK *v.* LAFAYETTE STROBRIDGE.

*Fraudulent concealment in sale of property.*

In the sale of a horse which has an internal and secret malady of a fatal character, no external indications of which exist, but which is known to the seller, and which he knows is not known to, or suspected by the purchaser, and which renders the animal of no value, and where the sale is for the apparent value, and the seller understands that he could not effect the sale if the condition of the animal was known to, or suspected by the purchaser, the seller is guilty of an actionable fraud.

Paddock *v.* Strobridge.

It is the duty of the seller in such case either to apprise the purchaser that he must take the animal with all faults, or in some way put him on his guard, or else disclose his knowledge upon the subject.

The suppression of the truth in such a case is equivalent to a positive representation that the animal is such as it appears as far as the seller knows, if he knows that the purchaser is acting solely upon that belief.

This rule has not been extended to cases where the thing sold is of some value, or the seller was not aware that the purchaser acted exclusively upon the expectation of the truth of the apparent condition of the thing sold. But the principle seems to be the same in all cases, that if the seller derives an advantage by means of a delusion which he knows to exist in the mind of the purchaser, and which he does not remove, or caution the purchaser in regard to, he is, to the extent of the damage thereby sustained by the purchaser, guilty of an actionable fraud. But the difficulty in the application of the rule to such cases has hitherto induced the courts to require proof either of artifice in disguising secret defects or positive misrepresentation, unless the defects are of a character to render the article essentially a different commodity from what it appears, and for which it is sold.

ACTION ON THE CASE for deceit in exchange of horses. Plea, the general issue; trial by jury, June Term, 1856,— UNDERWOOD, J., presiding.

The plaintiff's evidence tended to show that in September, 1853, he employed one Dow to go to market for him with horses; that Dow on his return put up or stopped at the defendant's tavern, in Peacham, and put his horse in the barn, there being no one present to take him, and went into the house; that the defendant soon came in and proposed to Dow to exchange horses, and said he had a young horse, too young for his business, (which was staging,) which had been used pretty hard, and wanted to be turned out; that Dow and the defendant went to the barn and looked at the defendant's horse, whose ankles were swolen; that the defendant remarked he had been used hard and stood on the floor, and, in answer to inquiry by Dow, said that he fed well, and had no cough, that he was young, not old enough for his business, and had been worked hard and was out of fix, and wanted to be turned out and run in full feed, and run in the yard through the winter; that Dow offered to swap for sixty dollars to boot, and the defendant offered twenty-five dollars, and that finally the trade was concluded, the defendant paying fifty dollars as boot; that Dow put the horse he obtained, a gray horse, in his wagon, and

started for Craftsbury; that he had proceeded but a few rods when the horse discharged blood with his manure, and before he had gone a mile he again discharged his manure with streams of blood, throwing it over the dasher into the wagon; that he then went back and told the defendant the trouble, and asked him to swap back; that the defendant said he did not think it would injure him, and declined to reëxchange; that Dow went home with the horse and doctored him till the next April, when he died of the same disorder, which was bloody flux; that said horse was apparently worth seventy-five dollars when the trade was made, and would have been worth that but for this disease.

The defendant was a witness, and his testimony tended to show that Dow called on him at Peacham, and they talked about trading; that the defendant told Dow he had a young horse that he had had a short time, which had been hard used and was out of fix, and unfit for use; that he wanted to put him away and get one he could use; that he and Dow went out to the barn and looked at the horses, and that he told Dow the horse was out of fix, but thought if turned out he would get over it by spring; that the horse was thin of flesh, and that he had owned him three or four weeks. The defendant admitted on cross-examination that he knew the horse discharged blood occasionally, and that he did not inform Dow of it; and testified that he did not know why he did not; that he meant by term "out of fix" that the horse was not fit for use; that he did not mean any thing in particular; that he meant he was "all out of fix." The defendant testified, among other things, as follows: "I am not sure whether Dow asked me whether the horse was sound; he asked me about the swollen legs, and whether he fed well; he asked if he could get him home; I told him he could, and we traded."

Dow, among other things, testified as follows: "I think after I came back to the defendant's, (after I had started for home,) I asked him if the horse could get to Craftsbury." The defendant's evidence tended to show that the horse he had of Dow was not worth over fifty dollars, and the plaintiff's evidence tended to show him worth from one hundred to one hundred and twenty-five dollars at the time of the trade. The defendant proposed to show

that the term "out of fix" was understood at Peacham to be a term used to put people on their guard. To this the plaintiff objected, and the court excluded it, and the defendant excepted.

The above was substantially all the testimony given. The court charged the jury that if the plaintiff recovered, the measure of damages was the difference between the value of the horse at the time of the exchange, with this inward malady upon him, and what he would have been worth without it, and the interest on that difference; and as to the value of the plaintiff's horse given in exchange for the defendant's, it had nothing to do with the question of damages, but was only to be considered with reference to the question whether the plaintiff was deceived by the defendant; that the less his value the less likely the plaintiff might be considered by the jury to have been deceived in the trade. The jury were further told that it would be for them to ascertain what representations were made by the defendant, and the manner of making them, and to consider whether a person of ordinary vigilance and prudence would have been likely to have been misled and thrown off his guard as to any secret malady of the kind; if they believed that the representations and conduct of the defendant on the occasion were of that kind, and were made by the defendant with intent to mislead Dow and put him off from inquiring as to the real difficulty, and Dow was thereby misled and thrown off his guard, and would not have so traded had he known of the malady, then the defendant was liable, and the plaintiff was entitled to recover. The jury were further told that if they found that Dow was wholly ignorant of this internal malady before the trade, and that it was known to the defendant, and that it was not obvious to Dow, and there were no indications or signs which would have led a person of ordinary vigilance and prudence to apprehend any thing of the kind, or to suspect it, and the defendant received from Dow such a consideration that he might reasonably suppose he would not have so traded had he been informed of it, and that Dow, if he had received such information, would not have so traded, then that the defendant was bound in good faith to have disclosed the facts, and if he did not, he was guilty of a deceit, for which he was liable. But if the jury found that the plaintiff's horse was of so small value that Dow could not reasonably have

expected to obtain a horse of any substantial value in addition to the fifty dollars paid him as boot, and that Dow traded without any special reference to the horse·being of value or not, then it could not be said he was deceived in the trade, and would not be entitled to recover.

The jury rendered a verdict for the plaintiff. To the charge of the court, as given, the defendant excepted.

*Cooper & Bartlett* and *T. P. Redfield*, for the defendant.

Has there been deceit practiced, and such as is actionable? No *statement* is claimed to have been made by the defendant about the horse that is *untrue*. It seems well settled at this day that in the sale of personal property, without warranty, and without false statement known at the time by the vendor to be false, the purchaser takes it at his own risk as to latent defects; *Mellish* v. *Matteaux*, Peakes' C. 115, was ·the sale of a ship with latent defects, not disclosed, and the action sustained. But the whole doctrine and authority of the case was overturned by Lord ELLENBORO in *Baglehole* v. *Walters*, 3d Camp. 154. His lordship says, "When an article is sold with all faults it is quite immaterial how many belonged to it within the seller's knowledge, unless he used some artifice to disguise them, and prevent their being discovered." In *Parkinsen* v. *Lee*, 2d East. 314, LAWRENCE, J., says: "In the sale of a horse the buyer must stand to all latent defects, if there be no warranty." Lord ELLENBORO in the same case concurs. In *Ormsod* v. *Heath*, 14 M. & W. 651, the same doctrine is fully sustained.

In *Pothell* v. *Walters*, 23d C. L. 40, Lord TENTERDEN lays down the rule, "If representation is made, the party making it knowing it to be false, and is calculated to induce the purchaser to act on the faith of it in such a way that he may receive damage, an action lies;" "a willful falsehood of such a nature is, in law, a fraud."

In *Emerson* v. *Brigham et al.*, 10 Mass. 197, (in case of the sale of *provisions*,) SEWALL, J., says, "Some *artifice must be proved.*" Story on Con. 522, after reviewing all the decisions at length, sums up the whole and says, "The ground upon which all these decisions proceed is that ordinarily a man relies upon his

Paddock *v.* Strobridge.

own judgment and skill in making a purchase, but if he actually repose confidence in the statement of .the vendor, as to matters of fact, material to the bargain, whether he be compelled to do so by the necessities of the case, as when he had not the means of knowledge, or is persuaded to do so by the seller, the reason of the rule (*caveat emptor*) fails, and an exception is therefore admitted."

See *Collins* v. *Dennison,* 12 Met. 549 ; *Warren* v. *Daniels,* 1st Mood & Malh. 90 ; *Torhell* v. *Babcock,* 2d do. 296.  Same doctrine in New York, *Hart* v. *Wight,* 17 Wend. 425 ; *Taylor* v. *Fleet,* 1st Barbour 473 ; *Otis* v. *Raymond,* 3d Cowen 413.

In *Stevens* v. *Webb,* 32 Com. L. 437, PARKE, B., says, " To constitute fraud it is necessary to prove that the defendant made some *false representation,* and unless there be a willful misrepresentation by him, the special plea is not made out." Our own courts have ever sustained the same doctrine ; *Judd* v. *Blake et al.,* 14 Vt. 413.  The vendor is not bound to disclose latent defects, unless, by his relation, special confidence is reposed.

The court in substance charged the jury they were to consider the trade, its consideration, &c., and if they thought Dow would not have traded if he had known the latent defects, then he was deceived and defrauded, and the action is, and the rule of damages what the gray horse was worth if sound.

*Peck & Colby,* for the plaintiff.

The charge was in effect that if the fact of the disease in the horse was known to the defendant, and not to the plaintiff, and could not be discovered by ordinary vigilance, and was intentionally concealed for the purpose of deceiving the plaintiff, then the defendant was liable in this action.  So held the court in *Hanson* v. *Egerly,* 9 Foster 359 ; 2 Kent's Com. 483 ; *Stevens* v. *Fuller,* 8 N. H. 483.

The opinion of the court was delivered by

REDFIELD, Ch. J.  The question in this case is whether, in the sale of a horse having an internal and secret malady, of a fatal character, and no external indications calculated to excite suspicion of its existence, but known to the seller, and not to the purchaser,

and which the seller knows or believes the purchaser would not buy if he did know of its existence, and still sells at such a price as the article seems to be worth, without disclosing the defect, he is guilty of such fraud and deceit as will be actionable.

There is no doubt that there is a class of positive misrepresentations affecting, more or less, the marketable price of commodities sold, for which the vendor is not legally liable. Such are those we every day encounter in the way of traffic, and which it is understood are nothing more than a species of badinage, or allowable chaffer. So, too, representations in regard to the state of the market, and other extraneous incidents, not affecting the state and quality of the article sold, and the suppression of facts of this character by the party profited thereby, although morally wrong, do not constitute an actionable fraud. The somewhat celebrated case of *Laidlaw* v. *Organ*, 2 Wheaton 178, where the purchaser of a quantity of tobacco obtained it much under its present value by not disclosing the news of peace, which was known to him, but not to the seller, is a very fair illustration of the rule of law upon this subject. In this case the seller inquired if there was any news calculated to enhance the price or value of the article, and the buyer made no assertion or suggestion calculated to impose upon the seller in regard to the news. The circuit court charged the jury that this did not amount to such fraud as will avoid the sale; MARSHALL, CH..J., in giving judgment says, " The court is of opinion the buyer is not bound to communicate intelligence of external circumstances which might influence the price of the commodity, and which was exclusively within the knowledge of the vendee. But at the same time each party must take care not to say or do any thing tending to impose upon the other. The court thinks the absolute instruction of the judge was erroneous, and that the question whether any imposition was practiced by the vendee upon the vendor ought to have been submitted to the jury." The disposition made of this case in the supreme court would seem to indicate that it was there considered that the testimony in this case did tend to show such imposition as would avoid the sale, or expose the party to an action at law. But I should not be prepared to believe that the rule of law, as at present recognized in the courts of law, or equity, will fully justify that view. It is more

Paddock v. Strobridge.

generally considered, perhaps, that the party is fully justified in taking advantage of any superior knowledge he may have of any extraneous circumstances not affecting the essential quality of the article sold, and where both parties have equal means of knowledge, and there is no positive misrepresentation.

But in regard to those incidents which do materially affect the quality and value of the article sold, the rule is different. It is certain no positive misrepresentation will be allowed here, and there is a degree of negative deceit which the more recent cases certainly do not justify. But negative deceit, like any other, must be practiced in such a manner, and upon such a subject, as to be calculated to mislead and impose upon a person of ordinary sagacity. And the vendor must know, at the time, that the vendee is misled, and must intend he shall be, and must do this for the purpose of gaining an unjust advantage, which he could not otherwise expect to do.

This negative deceit has more commonly been reached in the English courts by engrafting successive exceptions to the general rule of warranty, by way of implied warranties. As in regard to provisions, bought for consumption, that they are wholesome. So, too, in regard to manufactured articles purchased for a particular use, known at the time of sale to the vendor, it is said there is an implied warranty, although nothing is said that the articles are reasonably fit for the use for which they are purchased. So, too, of articles contracted to be delivered in future for any specified use, and some others, perhaps, where the law implies a warranty that the articles are of a merchantable quality in the absence of all stipulation upon the subject.

These cases, it is obvious, are nothing more than exceptions founded upon certain flagrant indications of fraud and deceit which do not exist in ordinary cases.

And following out this, as the leading idea, it seems now to be the settled rule of law in Westminster Hall, that there is an implied warranty on the part of the seller that the article sold is what it appears to be, so far as the vendor knows. In other words, that a defect in the article, which changes its essential character and renders it wholly unfit for the purpose for which it is purchased, will justify the vendee in rescinding the sale, or

bringing suit for damages at his election. It seems to be there considered that secret defects in the article sold, which materially affect its value, and which the vendor supposes the vendee would regard as an impassable barrier to the contract, must be disclosed or the contract is not binding. To have this effect the defect must be known to the vendor and wholly unknown to the vendee, and there must be no external or sensible indication calculated to excite suspicion in ordinary observers. It must be of such a character as clearly to have formed an impassable barrier to the contract, and so understood by the vendor at the time. In such case, the defect being known to one party and unknown to the other, is not strictly what the law understands by latent defects. And it is impossible to make any sensible distinction between such a case and one where the party uses some device to mislead the other party in regard to a defect which he might otherwise have discovered, or where he makes positive representations of soundness, knowing them to be false, which is done ordinarily to put the other party off his guard. It is putting the parties upon unequal footing, and without advertising the vendee that such is the vendor's purpose. For if the vendee is made fully to understand that he must take the article *with all faults*, or that he must not rely upon the vendor, this is equivalent to putting him upon his guard, and it is upon this ground that the case of *Mellish* v. *Matteaux*, Peake's cases 115, was doubted in *Baglehole* v. *Walters*, 3 Camp. 154, and in *Pickering* v. *Dawson*, 4 Taunt. 779. But the principle of that decision, in other respects, in the language of Chancellor KENT, 2 Comm. 482 and note, "remains unmoved." This case was the sale of a ship, which had a latent defect, known to the seller, and which could not have been discovered by the buyer. Says Chancellor KENT, "the seller was held to be bound to disclose it, and the concealment was justly considered to be a breach of honesty and good faith on general principles."

To this extent this same decision has been several times since recognized in the English courts. The principal of these decisions was thus stated by me, upon a former occasion, and which a pretty thorough reëxamination of the cases, on the present occasion, has served to confirm.

So, too, it is not always necessary that there should be an

express representation, one will often be inferred from circumstances which are in fact equivalent to such positive representation, as in *Bruce* v. *Reeder*, 17 Eng. C. L. 290, where the defendant induced the plaintiff to accept an insolvent tenant in his stead without making known such insolvency. The defendant made no positive representation whatever as to the person he offered as tenant. The court held the mere fact of his offering him as such to take his own place was equivalent to a representation of his solvency, and as he knew the contrary he was guilty of a fraud. BAYLEY, J., says, "I thought at the trial the keeping back that fact was, legally speaking, a fraud which rendered the defendant liable." Lord TENTERDEN says, "I think so now." BAYLEY, J., "It is very desirable, if possible, to *make* people honest." HOLROYD, J., "I think it was clearly a fraud." So, too, in *Hill* v. *Gray*, 2 Eng. C. Law 459, it was held, that suffering one to buy goods under a wrong impression as to their quality in an essential particular, is a fraud, although the seller did nothing to induce the misapprehension, and that the purchaser is not bound by the contract. The only misapprehension in this case was in regard to the picture, which was the subject of the contract, having belonged to the cabinet of Sir Felix Agar. It was sold and bought as one of Claude's, and was confessedly genuine; but the sale was held void because the purchaser was allowed to buy it, supposing it had belonged to that particular cabinet, which, in his estimation, greatly enhanced the value, and which the seller knew to be false. Lord ELLENBOROUGH said: "Although it was the finest picture Claude ever painted, it must not be sold under a deception.

This last case came under consideration in the C. P. so late as 1851, and JERVIS, Ch. J., said, quoting from the opinion that the purchaser had fallen into the delusion of believing the picture to have belonged to Sir Felix Agar's cabinet: "Not removing that delusion might be taken as equivalent to an express misrepresentation." These two last cases have never been questioned.

They seem to rest upon the principle that under some circumstances a *suppressio veri* is equivalent to a *suggestio falsi*. And of this, we think, there can be no manner of doubt. The difficulty will arise in the application of the principle in practice. Many

plain and flagrant cases may be supposed where no manner of doubt whatever will arise in the mind of any one.  The case supposed in argument of selling a vicious horse for horse-back or carriage use, which will be sure to kill the purchaser or his family, if put to use, and not guarded, or possibly in spite of all circumspection, the seller would no doubt be liable beyond the price of the purchase, by way of special damage, if he did not declare the fact.

And we may suppose cases of the sale of spurious articles, as of nutmegs made of wood, or white lead of whiting or ground stone, which is really of no value, or none for the purpose of the purchase.  There can be no doubt if the seller is aware of the deception and the buyer is ignorant ; such deceit will form the basis of an action at law, although no representation is made.  But if both parties are equally innocent, the contract is probably binding, certainly unless there is such a misapprehension in regard to the subject matter of the contract that the minds of the parties cannot be said to have met, which requires a strong case to excuse the purchaser at law, certainly.  Courts of equity sometimes interfere in such cases, upon grounds which would not always excuse the party at law.

And in cases of this character, where the price, or other circumstances, indicate that both parties are aware of the spurious quality of the article, and they are bought to sell, no action lies, for there is no deception.  But where fraud and damage concur, an action ordinarily lies.  And a representation sufficient to constitute fraud often exists without the use of articulate language.  And in a case like the present, where the hidden malady is known or believed to be of a fatal character, and to render the commodity valueless, and it appears to be valuable, and is sold as such, and this malady is known to the vendor and unknown to the vendee, and is known to form an impassable barrier to the sale, if disclosed, and the malady proves speedily fatal, we are not prepared to say that the action for deceit or false warranty will not lie.  We think it will as much as if the party had sold a horse which was not present, knowing it to be dead at the time, but without making any false representation in terms ; or as if he had sold the mere image of a horse at such a distance as to impose itself upon the senses for a living animal

Paddock v. Strobridge.

or a horse after having given it a slow but fatal poison, or where it had, to the knowledge of the vendor, received a fatal wound in a part not visible. There is no end to these illustrations. And they in no sense come up to the civil law rule that a sound price creates an implied warranty that the thing sold is sound; for that will make the vendor liable for defects wholly unknown to both parties, and possibly for defects which were known to both parties.

And we should not probably be prepared to say that a sound price, of itself, implies a warranty, in all cases, against secret defects known to the vendor and not known to the vendee. But we think even the latitude of the English common law, which upon this subject is proverbially lax, does not justify the vendor in palming off upon the vendee a valueless article which is apparently valuable, for a price corresponding to its appearance, under the delusion, in the mind of the vendee, that the thing is really what it appears to be, but which the vendor, at the time, knows to be a mere delusion. This amounts to nothing more than an implied warranty against selling a shadow for substance, an image for the reality. And in every such case the very sale is equivalent to a representation that the thing is, as far as the vendor knows, what it appears to be, and does impose upon the vendor the duty of correcting any such delusion into which he has led the vendee by offering to sell him for a valuable price, what he knows or believes to be, and which is really valueless, or of essentially different and less value than it appears to be and is taken to be by the vendee, and without which belief he would not have made the purchase, and this well known to the vendor.

The present case may be of this character. There was, no doubt, strong testimony tending to prove this, and even tending to prove the use of artifice by the vendor to mislead the vendee. But, in the charge of the court upon this point, many of the elements of the fraud seem not to have been specifically enumerated, and the jury might have inferred that the vendor was bound to disclose all the secret defects of the article, and which tended to lessen its value, whether they changed the essential character of the article or not, and whether they formed, in the belief of the

32

vendor, an impassable barrier with the vendee to entering into the contract or not. We think, therefore, the case will have to go to another trial, unless we are prepared to say that every sale of an article for a sound price does imply a warranty against secret defects materially affecting the value, and which are known to the vendor and unknown to the vendee. This is indeed the sensible rule upon the subject, and is very distinctly pointed at by some of the late English cases. But it is perhaps questionable whether any such rule is yet fully established. But it has been often held that, in the sale of a promissory note, there is an implied warranty that it is genuine and not a forgery; and especially, if the vendor knew it to be a forgery, should it be regarded as such a fraud as will avoid the sale. So, too, are we prepared to say, is there an implied warranty in the sale of live animals for a sound price or a valuable price, which are in apparent health, that they are not already affected by any secret but fatal malady, to the knowledge of the vendor. And in such cases belief must be regarded as knowledge, if it prove to be well founded. The case of payments made in counterfeit coin or bills, without any question being made at the time, is also a good illustration of the subject. The offer of the money as genuine is equivalent to a representation of its genuineness. The three English cases referred to of *Mellesh* v. *Matteaux, Bruce* v. *Ruler,* and *Hill* v. *Gray,* certainly justify the view we have here taken. And none of these cases have ever been doubted, except the first, and that only upon the ground that it was a sale *with all faults.* Chancellor KENT also regards the law as going the full length of all these cases. And for one, I confess I should scarcely know how to defend a doctrine, coming short of the rule we here adopt.

The opinion in 9 Foster, by Ch. J. WOOD, 343, 359, *Hanson* v. *Edgerly,* contains a thorough and critical revision of the leading cases upon the subject, and the conclusion of the learned judge is certainly very sound: "It is going far enough to hold that an omission to disclose them (secret defects known to the vendor and unknown to the vendee) with a design of deceiving the party or an intentional concealment by which he is deceived and injured, will render the party responsible. It would be going quite too far

to say that a simple unintentional concealment or omission to disclose them, would render the party liable for the damage sustained."

This seems to be placing the subject on a sound basis. That there is no positive duty on the vendor to ·disclose secret defects, in the article, but if he conceal them even by silence, when he knows the other party has fallen into a delusion in regard to them, and is making a purchase which he otherwise would not make, or at a price materially beyond what he otherwise would, in consequence of such delusion, this is equivalent to a false representation or the use of art to disguise the defects of the article.

We think this case contained testimony tending to show both that the sale was knowingly and intentionally made under such a delusion on the part of the vendee, which did materially increase the value of the article in his mind, and without this he would not have entered into the contract; and this well known to the vendor, and acted upon by him with the purpose of defrauding the vendee; and also that the vendor used artifice, more or less, to keep up this delusion, both of which will render him liable for the damage thereby sustained. But as the case was not put distinctly to the jury upon either of these grounds, and as we are not fully prepared to say that the vendor of personal property is, in all cases, bound to disclose all known defects in the article, which are unknown to the other party, and not discoverable by the exercise of ordinary care upon the subject, we reverse the judgment below, and remand the case for a new trial.