LEACH, Executor, etc., Appellant, vs. LEACH, Respondent.

*February 2 — February 23, 1886.*

DOWER: WILLS: TRUSTS AND TRUSTEES. *(1, 3) Release of dower, etc.: Election to take under statute instead of under will. (2, 3) Sale to executor, trustee, etc.: Fraud: Burden of proof. (4) Insane widow: When guardian* ad litem *may avoid release. (5) Evidence: Transactions with insane person.*

1. A mutual agreement under seal between husband and wife by which each releases to the other all right, title, and interest in and to all the estate and property of the other, and each gives full consent to the other to devise, bequeath, and dispose of such property, is void, and, after the death of the husband, does not prevent the widow from electing to take the share of his estate provided by statute in lieu of the provision made for her in his will.

2. In order to sustain a sale of property by a *cestui que trust* to his trustee, especially if the consideration was inadequate, the burden is upon the trustee to show that the *cestui que trust* knew, at the time, all the facts relating to the value of the property and his rights therein.

3. After electing to take the provision made for her by law instead of that made by her husband's will, a widow proposed to the executors to release all her interest in the estate in consideration of $2,000 and a right to use a part of the homestead. She was over seventy years old, could neither read nor write, and was ignorant of the amount of the estate, and of the value of her interest therein. Such interest was worth from $7,000 to $8,000. The executors were nephews of the testator and were also residuary legatees. One of them, who, under the terms of the will, would be especially benefited by such release, had been living in the testator's family. They knew the value of the estate and of the widow's interest, but, without informing her as to such value, accepted her proposition; and she thereupon executed a deed to them releasing all her interest in the estate. *Held,* that such deed was voidable by her.

4. The widow having become insane after the execution of the deed, her guardian *ad litem* might contest the validity thereof at the hearing upon the final settlement of the estate.

5. To prove that a widow had knowledge of the value of her husband's estate, it was attempted to be shown by the executor (the opposite party) that she had seen some of the notes belonging to the estate. The widow could not read or write and, before the trial, had become insane. *Held,* that the evidence was properly excluded.

APPEAL from the Circuit Court for *Kenosha* County.

The following facts appear from the record, and were, in substance, found by the trial court:

June 12, 1876, the testator, William Leach, and the defendant, *Sarah Leach*, were married. *Sarah* then owned forty acres of land and personal property to the amount of $600. June 27, 1876, the said William and *Sarah* mutually agreed, by writing under seal, to relinquish and release, each to the other, all right, title, and interest in and to all the estate and property which the other then had or might thereafter acquire; granting and giving free and full consent, each to the other, to will, bequeath, and dispose of any and all such property, both real and personal. They lived together as such husband and wife on said William's homestead farm, in the town of Brighton, in Kenosha county, from the time of their marriage until November 21, 1879, when said William died, leaving him surviving said *Sarah* as his widow, who was then about seventy-five years of age, and thirty-two nephews and nieces, but no child, nor brother nor sister, nor father nor mother. At the time of his death he was seized and possessed in his own right of real estate in Kenosha county valued at $14,966, and personal estate therein valued at $14,916.29, making $29,882.29. He left a last will and testament, which was executed June 5, 1879, and was admitted to probate in the county court for Kenosha county, January 6, 1880.

By said will the testator gave, devised, and bequeathed to his nephew *John Leach* (the plaintiff), then living in his family, all and singular the property, real, personal, and mixed, which he might own or have any interest in at the time of his death, subject to and charged with the conditions and provisions therein contained. After several gifts and bequests, by the sixth clause of the will he gave to said *John Leach* $2,000, "to the exclusion and in preference to any thing or sum" thereinafter named. By the seventh

clause he gave to said *John Leach* the free use of all his farm tools, implements, machinery, farm, stock, and all household furniture, excepting his melodeon, to hold the same until the final distribution of his estate, four years after his death, being accountable only for the actual cash value at which they should be appraised at the date of the inventory to be made, and also thereby gave said *John Leach* "all farm produce, such as grain, hay, feed, etc., including growing crops." By the eighth clause, he gave said *John Leach* the free use and occupation and rental of *his · homestead farm*, in said town of Brighton, on which he then resided, containing about 350 acres, for four years after his death, provided he, during the time, paid all taxes, kept the buildings reasonably insured, and kept up necessary repairs at his own expense, and provided he permitted his then present wife (the defendant), if she should survive him, to occupy the west wing of his "homestead, during her life-time, free of rent, and also provide her with fuel sufficient for one stove, properly prepared for the same, and also allow her the joint use of the cellar." By the ninth clause he gave to said *John Leach* $1,000, in trust for a purpose named. By the eleventh clause, after the payment of debts, expenses, and the bequests named in the will, and at the end of four years after his death, he gave and bequeathed to said *John Leach* all and singular his property, real, personal, and mixed, which he might own at the time of his death, including all rents and interest accruing during the four years, subject to and charged with the conditions and provisions that he should pay to each of his nephews and nieces, and also reserve for himself, a sum of money constituting an equal share of all his estate last above bequeathed to him, including money received and realized from the sale of such real estate as did not constitute his homestead farm. In the eleventh clause the testator also expressed the desire that said homestead farm should be re-

tained by said *John Leach*, at the valuation of $12,000, including all the farm personal property belonging thereto which might be on the same at the time of his death. The will further provided that if the testator should survive any of his nephews or nieces, then the share of such one should go to the heirs of his or her body, but, if no such heirs, then to be equally divided between the other surviving nephews and nieces; that said *John Leach* should have no compensation for his services in settling and managing the estate, except "actual disbursements." *John Leach* and another nephew, Oliver Leach, were appointed executors of his will. There were thirty-two residuary legatees, including said *John* and Oliver Leach, interested in said estate.

On the same day that said will was admitted to probate, to wit, January 6, 1880, letters testamentary were by said county court duly issued to the said *John* and Oliver Leach, as such executors, and on the same day they both duly qualified and entered upon their duties as such executors. On the same day the said *Sarah Leach*, as such widow, filed with the county judge of Kenosha county, with the papers in the matter of said estate, a notice in writing, by her signed with her mark, dated January 5, 1880, to all whom it might concern, that she, as such widow, thereby elected "to take the provision made for her by law instead of the provision made for her in and by the said last will and testament of her deceased husband, the said William Leach."

January 6, 1880, she signed a paper with her mark, addressed to said executors, whereby she, in effect, proposed to release all claim to dower, all right to homestead and personal property in the estate of said deceased, for the sum of $2,000, to be paid to her within sixty days from that date, together with the use of the west wing of the house on the homestead during life, and be provided with fuel for one stove, and the joint use of the cellar under said house,

during the term of her natural life, which proposition purported to be so "made solely for the purpose of settlement," and "to remain open for thirty days." Prior to said January 6, 1880, when said widow made said written proposition, said Oliver Leach had an interview with her, and, in consequence of what occurred between them at said interview, she made said proposition, but what occurred at said interview is not disclosed by the evidence.

January 24, 1880, the appraisement of the real and personal property belonging to the said estate was made and computed, and thereupon the said *John* and Oliver Leach, as such executors, filed in said county court their inventory of said estate, together with said appraisement, showing the real estate to be of the value of $14,966, and the personal property of the value of $14,916.29, making $29,882.29. About February 1, 1880, said executors and legatees accepted said written proposition so made by said widow, and thereupon, *as such executors*, paid her, February 7, 1880, $2,104, and she thereupon, and at the same time, under her hand and seal, and for and in consideration of the sum last named, executed a deed to the said *John Leach* and Oliver Leach, as such executors, wherein and whereby she remised, released, conveyed, and quitclaimed unto the said executors, "their heirs and assigns forever, all the right, title, interest, claim, and demand which" she had in and to all the real estate therein described (being all of which the testator died seized) "as widow and heir" of said deceased, "whether such interest be of the nature of dower, life-estate, estate in remainder or reversion, or otherwise;" and she also thereby granted, transferred, and conveyed to the said executors all her "right, title, and interest in and to all personal property, of whatsoever nature or name, forming part of the estate of said William Leach, and all claim which, as his widow," she might have thereto, and recited that said deed was given to enable said executors to carry out the pro-

visions of the will, etc.  At the time said proposition was made and accepted, and said deed made, executed, and delivered to them by said *Sarah Leach*, the said executors were fully informed of the amount, extent, and value of the real estate of said deceased, and her rights and interests in the same after she made her said election, and its value, "but they failed and neglected to inform her of said rights and interests, but withheld the same from her, as well as its value." Said widow was over seventy years old when her said husband died.  She could neither read nor write.  She was ignorant of the amount, extent, and value of the said real and personal estate at the time she made her election not to take under the will but under the statutes; and she was also ignorant of the same when she made said written proposition, and also when said proposition was so accepted, and also when she made said deed and transfer.

Oliver Leach resigned the said office of executor, and his resignation was accepted by said county court, November 9, 1881, and the said *John Leach* gave further bond, and qualified as sole executor and trustee; and on January 30, 1884, said *John Leach* filed his account as such executor in said county court, and his petition to have it allowed, and prayed that the residue of the estate be assigned to such persons as were, under the will and by law, entitled to the same.  The widow had an apoplectic fit November 5, 1880, and was not able to transact business thereafter.  Walker Whitley was appointed her guardian *ad litem*, May 15 or 16, 1884.  May 16, 1884, the county court adjudged that said widow was entitled to take under the statute, regardless of said post-nuptial agreement or her said deed of release. From that judgment the said *John Leach* appealed to the circuit court, June 25, 1884, and, after a trial, at which Judge BENNETT presided, that court found the facts substantially as above stated.

As conclusions of law, the circuit court found, in effect,

that the agreement between William and *Sarah Leach* made June 27, 1876, was null and void, and not binding upon *Sarah;* that her proposition to the executors, January 6, 1880, their acceptance thereof, and her deed to them in pursuance thereof, February 7, 1880, were each voidable, and not binding upon her; that by electing not to take under the will, but under the statutes, she became entitled to receive all of the articles of apparel and ornaments of herself and husband, the household furniture of the deceased not exceeding $250, also one third part of the net personal estate after payment of funeral charges, expenses of administration, and the debts against the deceased, but that she must allow for the sum or sums already received, to wit, $2,104; that the homestead of which said testator died seized descended to her in fee, and that she was entitled to the use of one third of the other real estate of which he died seized, during her natural life; and that she was entitled to judgment in accordance with said findings, with costs to be taxed and paid by said *John Leach* out of that portion of the moneys belonging to said estate in which the widow had no interest. Judgment was entered accordingly, from which the said *John Leach* appeals.

For the appellant there were separate briefs by *Merton & Kearney*, attorneys, and *J. V. Quarles*, of counsel, and the cause was argued orally by *Mr. Kearney* and *Mr. Merton*. To the point that a guardian could not avoid or elect in matters of this kind, they cited *Van Steenwyck v. Washburn*, 59 Wis. 483; *Rice v. Cleghorn*, 21 Ind. 80; Perry on Trusts, 241.

For the respondent there was a brief by *Dodge & Fish*, and oral argument by *Mr. Dodge* and *Mr. J. T. Fish*. They cited *Fox v. Macreth*, 2 Cox, 320; *S. C.* 1 White & Tudor's L. C. 115, and notes; *Torrey v. Bank*, 9 Paige, 649–663; *Michoud v. Girod*, 4 How. 503–554; *Devoue v. Fanning,* 2 Johns. Ch. 252; *Pickett v. School District*, 25 Wis. 551; *In*

*re Taylor Orphan Asylum,* 36 id. 534; *Cook v. Berlin W. M. Co.* 43 id. 433; *O'Dell v. Rogers,* 44 id. 136.

CASSODAY, J.   There can be no question but what the circuit court was right in concluding that the agreement given by the defendant, *Sarah,* to her husband a few days after their marriage, purporting to release all her interest in his estate, was null and void in law, and not at all binding upon her after his death.   *Wilber v. Wilber,* 52 Wis. 298; *Munger v. Perkins,* 62 Wis. 504.

Since the testator died leaving him surviving no lawful issue, it follows that, had he made no will, all his property, both real and personal, would have descended to his wife, the defendant in this action, subject, of course, to the payment of debts, etc.   Subd. 2, sec. 2270, and subd. 1, 6, sec. 3935, R. S.   But here the testator did leave a will, with the provisions indicated in the statement of facts.   The testator, by his will, having so made provision for his widow, she was thereby put to her election whether she would take the provision so made in his will, or claim the share of his estate provided by statute.   Sec. 2171, R. S.   Immediately upon the probate of the will, January 6, 1880, she filed in the court having jurisdiction of the settlement of the estate, notice in writing to the effect that she elected to take the provision made for her by law instead of the provision so made for her in the will, as required by the statute.   Sec. 2172, R. S.   Upon so filing that notice she at once became " entitled to the same dower in his [the testator's] lands, and the same rights to the homestead, and the same share of his personal estate, as if he had died intestate," except that " the share of personal estate which she " so took was restricted to " the one-third part of his net personal estate." Sec. 2172, R. S.; *In re Wilber,* 52 Wis. 297; *Hardy v. Scales,* 54 Wis. 452; *Melms v. Pfister,* 59 Wis. 191; *Van Steenwyck v. Washburn,* 59 Wis. 496.

At the time the widow so made her election, the executors, of whom the plaintiff was one, held in their hands, in trust, as such executors, personal property valued at nearly $15,000. Of the net amount of this sum the widow was then entitled in her own right, and as her own property, to the one-third part thereof, or nearly $5,000. *Ibid.* In addition, she was, under the statute cited, then entitled to the "same rights to the homestead . . . as if he [the testator] had died intestate:" which, as we have noticed, gave her the absolute right to it as her own property. This is not in conflict with anything said in *Ferguson v. Mason*, 60 Wis. 377; for in that case there was no will, and of course the effect of an election not to take under a will but under the statutes did not arise. The homestead of which she so took the absolute title consisted of forty acres of the farm upon which the testator died, and upon which she still resided, with the buildings and improvements thereon. This homestead does not appear to have been separately valued, but counsel seemed to concede that it was worth two or three thousand dollars. In addition to this she was entitled to dower in the balance of the lands. This dower right may not have been regarded as of very much value at the time, as she was then about seventy-five years of age. Obviously, her interest in the estate, at the time of filing her election to take under the statute, was from seven to eight thousand dollars. It was that entire interest which she proposed in writing to "release" to the executors for $2,000, to be paid in sixty days from that date, together with the use of the west wing of the house on the homestead, fuel for one stove, and the joint use of the cellar during her life. In other words, she proposed to release to the executors forever the whole seven sevenths of what she had in the estate if they would allow her to receive and retain less than two sevenths of what was then in law her own property. The mere statement of the proposition repels any inference

of complete knowledge on her part, at the time, of the extent and value of her rights and property in the estate. Assuming that she had such knowledge at the time, it repels all reason and motive for the unusual haste in making the proposition on the very day of the probate, or putting it in the form of a bargain and sale. People of her age, who can neither read nor write, and are ignorant withal, are at least conservative, and are not ordinarily inclined, without any suggestion or prompting from any one, and immediately after having asserted their legal rights, to deliberately propose in writing to barter away over $7,000 in money and property for the privilege of retaining $2,000 out of it.

But it is said that she had the legal right to give away the whole or any part of her property. Undoubtedly every adult of sound mind, including widows of the defendant's age, may, of their own free will, give away their property, or any part of it, to whomsoever they may choose, and no one not having any legal or equitable claim upon it can rightfully object; but the transaction before us does not purport to be a gift. There is nothing in it indicating love or affection as a consideration. On the contrary it purports to be an offer to release for a consideration to be paid, culminating in a transfer and conveyance upon the receipt of the consideration. Can it be sanctioned upon such a basis? By the will the whole estate was given to the plaintiff, upon condition that he pay the debts, expenses, and special bequests named, and then, upon the final settlement of the estate, divide the rest, residue, and remainder among the testator's thirty-two nephews and nieces, including the plaintiff and his then co-executor. The testator also gave to the plaintiff a specific legacy of $2,000; and also the free use, occupation, and rental of his homestead farm, tools, implements, machinery, stock, and household furniture for four years, and then only to be accountable

for their actual cash value at the date of inventory; and also gave him " all farm produce, such as grain, hay, feed, etc., including growing crops," with the privilege of taking said farm and personal property at a valuation named, he paying taxes, repairs, and insurance. Of course it was greatly to the advantage and benefit of each and all of the residuary legatees to obtain the widow's share of the estate upon the terms proposed; and, in addition, it was of especial benefit and advantage to *John*. Besides, *John* and his then co-executor took one third part of the personal estate, amounting to nearly $5,000, in trust for the widow immediately upon her election to take under the statutes. *Scott v. West*, 63 Wis. 555; *McCants v. Bee*, 16 Am. Dec. 610, and notes. *John* lived with the testator's family on the home farm at the time of the execution of the will; and it may be fairly presumed that he continued to reside there after the testator's death. His relations, as a trustee and otherwise, with the widow, were certainly more intimate than in *Davis v. Dean*, which we have just decided.[1] It conclusively appears that *John* and Oliver knew the value of both the real and personal estate before accepting the proposition of the widow; for, prior to that time, the appraisement had been made, and they had filed their inventory with such appraisement.

It is urged that there is no evidence to support the finding of the court to the effect that the widow made the proposition in writing mentioned, in consequence of what had previously occurred between her and one of the executors at an interview then had; nor any evidence to support the findings that she was ignorant of the amount, extent, and value of the real and personal estate at the time she made her election; or that she was so ignorant at the time she made the written proposition; or that she was so

[1] In *Davis v. Dean* a motion for a rehearing was denied May 15, 1886, and the case will be reported as of that date in 66 Wis.— REP.

ignorant at the time the proposition was accepted; or that she was so ignorant at the time when she made the deed and transfer. The more serious question is whether there is any evidence that the widow did have knowledge of the amount, extent, and value of the real and personal estate, and her rights and interests in the same, at the time she made the deed and transfer. The court found that, although the executors knew all the facts in the premises, yet "they failed and neglected to inform her of said rights and interests, but withheld the same from her as well as its value." There is no claim, nor evidence tending to prove, that they ever did give her any such information.

To sustain the purchase, it was incumbent upon the plaintiff to prove that the widow, at the time, knew all the facts and her interests and rights in the premises. Then he would have brought his case within the rule stated by Lord ELDON, "that a trustee may buy from the *cestui que trust, provided* there is a distinct and clear contract, ascertained to be such after a jealous and scrupulous examination of all the circumstances, proving that the *cestui que trust* intended the trustee should buy, and there is *no fraud, no concealment, no advantage* taken by the trustee of *information acquired by him in the character of trustee.*" *Coles v. Trecothick,* 9 Ves. Jr. 246, 247. He then admits it to be "a difficult case to make out wherever it is contended that the exception prevails." In a later case the same learned chancellor, speaking of this "difficulty in supporting a purchase by a trustee from the *cestui que trust,*" said: "It might be better embraced under the policy of the law;" and then quotes the above language, and adds: "If the court *can discover* that some advantage has been taken, *some information acquired,* which the other did not possess, *though it is not to be precisely discovered, inadequacy,* without going to the length of requiring it to be such as shocks the conscience,

will go a vast way to constitute fraud." *Morse v. Royal*, 12 Ves. Jr. 373.

In the very recent case of *Gandy v. Macaulay*, L. R. 31 Ch. Div. 1, a testator bequeathed one half of his residuary personal estate, consisting principally of railway shares and stocks, to his sister, H., and one quarter thereof to each of his two nieces, M. and F., and appointed H. and B. executors of his will, and then died, in 1855. This residuary personal estate was, at the time of passing the residuary account, valued at £42,000. The nieces, M. and F., lived with their aunt, H. In 1859, the nieces being of age, each executed a release of her interest in the estate to her aunt, H., in consideration of which the aunt paid to each niece £10,500, being just the appraised value of her share. The aunt, H., died in 1879. In 1883 the action was commenced by one of the nieces to set aside the release. It appeared in evidence that the amount received by each niece from her aunt was only a little more than two thirds of what her share was worth when she gave the release. This evidence, according to BRETT, M. R., made "it necessary to look carefully at the release itself; . . . and I look," he continued, "for a recital to show why the two nieces did so strange an act. But I find no recital which would call to their attention their position. Therefore I must notice the fact of giving up the property, and the want of the recital in the deed. These are two circumstances much to be considered, and they seem at once *to shift the burden of proof*, and to make it necessary that those who wish to uphold the release should show that full knowledge was given to these ladies of what they were doing, before they came to so strange a determination." He then goes on to show that if the aunt and her solicitor knew the facts, and did not tell the nieces, then it was a fraud; and if they did not know the facts, then the " deed of release was signed by them in a state of

ignorance of the facts,— an ignorance participated in by the aunt and by the solicitor." Lord Justices Cotton and Fry filed concurring opinions, all agreeing that the inadequacy of price, or, rather, the absence of any consideration, and the absence of all evidence or recitals in the deed tending to show that the nieces were fully informed of the value of their interests in the estate, were sufficient to authorize and require that the deed of release should be set aside, even when there was no ground for inferring any fraud on the part of the aunt or the solicitor.

If such is the law where the amount retained by the trustee without consideration, in pursuance of the contract of purchase, is less than one third of the value of the *cestui que trust's* interest in the estate, in an action not commenced until twenty-four years after the delivery of the release, and four years after the death of the trustee, then the rule must at least be as stringent in a case like this, where the amount retained by the trustees without consideration, in pursuance of the contract of purchase, is more than five sevenths of the value of the *cestui que trust's* interest in the estate at the time, and where the trustees were, at the time, fully advised of such value, and all the circumstances indicated that the *cestui que trust* was not so advised, but ignorant of such value. This rule is in strict harmony with the recent decision of this court in *Davis v. Dean, supra.* Besides the above cases and those cited by counsel for the defendant, see, also, to the same effect, *McCants v. Bee,* 16 Am. Dec. 610, and notes; *Ringgold v. Ringgold,* 18 Am. Dec. 250, and notes; *Keaton v. Cobb,* 18 Am. Dec. 595; *Drake's Appeal,* 45 Conn. 9.

We do not think there was any error in excluding the testimony of the plaintiff as to the defendant having seen some of the notes belonging to the estate. He was a party to the controversy, and she was insane at the time of trial. Besides, she was unable to read or write. The mere in-

spection of notes by such a person would impart no more information to her as to their value than though she had been blind.

There can be no question of the right of the defendant, by her guardian *ad litem*, to contest the validity of the transfer. *Salter v. Krueger, ante*, p. 217.

The view we have taken of the case obviates the consideration of any of the other questions discussed.

*By the Court.*— The judgment of the circuit court is affirmed.