Davis and others vs. Dean and others.

Davis and others, Appellants, vs. Dean and others, Respondents.

*January 15 — May 15, 1886.*

Deed. *(1) Mental capacity of grantor. (2) Fraud: Undue influence: Confidential relations: Burden of proof.*

1. The evidence in this case — showing, among other things, that a woman eighty years old and very feeble had been fatally injured by an accident; that for a week she had suffered intense pain; that her nervous system had been shattered; that she had fever almost constantly; that medicines were being frequently and constantly administered to her to quiet her nerves or deaden pain; and that she was never fully conscious of anything after the morning after the execution of conveyances of her property,— is *held* not to sustain a finding of the trial court that she was mentally competent to make such conveyances.

2. Where an aged and infirm woman, a few days before her death which resulted from a painful accident, and while in a prostrated and precarious condition, conveyed the bulk of her property to a young man who stood in the relation of an adopted son to her, who had married her granddaughter, and in whom she trusted, thus disinheriting her daughter and grandchildren with whom her relations were friendly, and where the circumstances suggest an effort on the part of the grantee to keep those most interested in ignorance of the fact that she was about to convey her property to him, the burden of proof is upon the grantee to show absence of fraud and undue influence.

APPEAL from the Circuit Court for *Rock* County.

Hannah W. Sparrowk, late of the county of Rock, died intestate November 29, 1883. The plaintiffs and the defendant *Alice C. Dean* are her only heirs at law. The defendant *John Sparrowk* was her husband. On November 23 of that year she executed to the defendant *George E. Dean* conveyances of certain real estate in that county owned by her. The land so conveyed was worth between $4,000 and $5,000, and constituted substantially the whole of her estate. Her conveyances to *Dean* were made without consideration. Her husband, *John Sparrowk*, signed the conveyances, but is not named therein as a grantor.

This action was brought to procure the rescission and cancellation of such conveyances on the grounds that Mrs. Sparrowk, when she executed them, was not of sound and disposing mind and memory; and if she was, that they were obtained by means of the fraud of the grantee, and the exercise by him of undue influence upon the grantor. The cause was tried in the circuit court, and resulted in findings that Mrs. Sparrowk, when she executed the conveyances, was mentally competent to make valid conveyances of her land, and that the same were executed by her voluntarily, and of her own free will, without fraud or undue influence on the part of her grantee, and consequently

that such conveyances were valid. Judgment was thereupon entered dismissing the action, with costs. The case is further stated in the opinion. The plaintiffs appeal from the judgment.

For the appellants there was a brief by *John M. Whitehead*, attorney, and *J. W. Sale*, of counsel, and oral argument by *Mr. Whitehead*. To the point that Mrs. Sparrowk did not have mental capacity to make a valid contract, they cited *Burnham v. Mitchell*, 34 Wis. 117; *Wright v. Jackson*, 59 id. 569; *Haydock v. Haydock*, 33 N. J. Eq. 494; *Duncombe v. Richards*, 46 Mich. 166; *Smith v. Smith*, 60 Wis. 329; *Delafield v. Parish*, 25 N. Y. 44; *Jacox v. Jacox*, 40 Mich. 473; *Moore v. Moore*, 56 Cal. 92; *Kuelkamp v. Hidding*, 31 Wis. 510; *Tracey v. Sacket*, 1 Ohio St. 58; *Cadwallader v. West*, 48 Mo. 491. A lower degree of intellect suffices ordinarily to make a will than is required to make a valid contract. *Converse's Ex'r v. Converse*, 21 Vt. 168; *Stewart's Ex'r v. Lispenard*, 26 Wend. 306, 311; *Delafield v. Parish*, 25 N. Y. 102; 1 Parsons on Con. (6th ed.), *387; Wharton & S. Med. Jur. secs. 19, 20; 3 Washb. on R. P. (4th ed.), *686. As to undue influence and the burden of proof, they cited *Haydock v. Haydock*, 33 N. J. Eq. 494–5; *Allore v. Jewell*, 94 U. S. 510, 511; *Harding v. Wheaton*, 2 Mason, 378; *Tracey v. Sacket*, 1 Ohio St. 58; *Delafield v. Parish*, 25 N. Y. 92; *Tyler v. Gardiner*, 35 id. 580; *Seeley v. Price*, 14 Mich. 545–6; *Harvey v. Sullens*, 2 Am. Rep. 493; *Cadwallader v. West*, 48 Mo. 494; *Sweet v. Bean*, 67 Barb. 94; *Duncombe v. Richards*, 46 Mich. 168, 172; *Dent v. Bennett*, 4 Mylne & C. 269; *Bergen v. Udall*, 31 Barb. 23; *Whelan v. Whelan*, 3 Cow. 576; *Taylor v. Taylor*, 8 How. 199 et seq.; *Jacox v. Jacox*, 40 Mich. 476; *Mulock v. Mulock*, 31 N. J. Eq. 595; *Ashton v. Thompson*, 32 Minn. 25; Story's Eq. Jur. sec. 218; *Huguenin v. Baseley*, 14 Ves. Jr. 294; *S. C.* 3 L. C. in Eq. 145; *Garnsey v. Mundy*, 24 N. J. Eq. 243;

*Sears v. Shafer*, 6 N. Y. 272; *Watkins v. Brant*, 46 Wis. 419; *Parfitt v. Lawless*, 4 Eng. (Moak), 693–4; *Archer v. Hudson*, 7 Beav. 551; *Thorn v. Thorn*, 51 Mich. 167. ·

*B. F. Dunwiddie*, attorney, and *Ogden H. Fethers*, of counsel, for the respondents, contended, *inter alia*, that the evidence did not show any such confidential or fiduciary relation between the parties to the conveyances as would raise a presumption of fraud or undue influence, citing *Dean v. Negley*, 41 Pa. St. 312; *Eckert v. Flowry*, 43 id. 46; *Webber v. Sullivan*, 58 Iowa, 260; *Will of Martin*, 98 N. Y. 197; *Cowee v. Cornell*, 75 id. 101; *Jackson v. Jackson*, 39 id. 155.

The following opinion was filed February 2, 1886:

LYON, J.   It may be well at the outset to state the relation of the parties to each other and to this controversy.

For many years previous to 1863 or 1864, *John Sparrowk* owned, and with his wife and family lived upon, a farm of eighty acres in the town of La Prairie, in Rock county, and continued to reside there until the death of Mrs. Sparrowk, in 1883.   He also owned a wood lot in the town of Bradford, in the same county, containing fourteen and two thirds acres.   In 1863 or 1864, he conveyed all his said land to his wife, through the intervention of a trustee, and the title thereto remained in her until she executed the deeds to *Dean*.

Mr. and Mrs. Sparrowk were married in 1832, and had six or seven children.   Of these only the plaintiff *Mary Melissa Davis* (who is a married woman) survived in 1883. One of the deceased children, a daughter, was the wife of Henry Davis.   She left eight children, who are still living. One of these is the defendant *Alice C. Dean*, wife of the defendant *George E. Dean*.   The other seven, together with *Mary Melissa*, are the plaintiffs in this suit.   Four of the Davis children are minors, and appear herein by their duly appointed guardian *ad litem*, Henry Davis, their father.

The defendant *George E. Dean* went to live with Mr. and Mrs. Sparrowk when he was seven years old, and continued to live with them most of the time until his marriage with their granddaughter, *Alice C. Davis*, and afterwards until the spring of 1883, when they removed to another house about one fourth of a mile distant. Mr. and Mrs. Sparrowk always treated him as a son, and he called them father and mother. They had no living son when he went to them, or afterwards, and although they never formally adopted him, they regarded him as their child, and each stood *in loco parentis* to him.

During the year 1883 the strength of Mrs. Sparrowk, then in her eightieth year, materially failed, as did also her intellectual faculties, especially her memory. This was not the result of disease, but of old age. She had been a strong active woman, but at the time above mentioned was very feeble, could scarcely walk at times, and required assistance to rise from her chair. It frequently happened that after she had related something she would repeat it many times, forgetting that she had told it before. It is probable, however, that she retained sufficient mental capacity to transact any ordinary business, yet it cannot be doubted that as her bodily and mental infirmities progressed with her advancing age she was liable to be more easily controlled or influenced by those about her, particularly members of her own family, upon whose kindly offices she was obliged to rely more and more for her comfort and welfare.

On Friday, November 16, 1883, Mrs. Sparrowk, in attempting to seat herself in a chair, fell to the floor and fractured the neck of her left thigh bone (the *femur*) within the capsular ligament. Of course such an injury is a very serious one, and when suffered by a person of her age, and in her condition, is almost necessarily fatal. Dr. Seeber was called and reduced the fracture, but had little or no hope of her recovery. He administered to her morphine and Dover's

powders on the day she was injured. On the next day, Saturday, November 17th, he added quinine and whisky to the treatment, because he found her nervous and prostrated from the effects of the injury. The same treatment was continued until the following Wednesday, when the quantity of the tonic was increased somewhat. On Thursday the doctor put her upon bromide of potassium to quiet her nerves, and she seems to have been kept upon that treatment for some days. She took but very little food after she was injured. She constantly weakened, and her voice became so weak that it was difficult to hear what she said.

Mrs. Sparrowk suffered most intense and agonizing pains from her injury, at times, for nearly a week. She often groaned and screamed with pain. She had a high, nervous fever nearly all the time, except a few hours in the early morning of each day, when it seemed to abate. She would frequently wring the bed clothes with her hands, and would throw them off, exposing her person. She took no notice of the calls of nature, and it did not seem to disturb her when she had involuntarily responded to them without preparation therefor. She was also afflicted with bed sores. In a word, her condition was most deplorable. On Thursday night, November 22d, she was peculiarly restless and in great pain until about 1 o'clock on Friday morning, when she sank into a sound sleep and slept until daylight. Up to this time bromide of potassium had been administered very freely to her; sometimes as often as once an hour. From this time there seems to have been a marked change in her condition. She does not appear to have suffered, or, at least, to have been conscious of such intense pain. She was awake during the forenoon of Friday about two hours, and seemed unusually bright. During this time she disposed of her personal effects, or some of them, by directing her husband to whom they should be given,— principally to her grandchildren.

During the forenoon of Friday she again fell asleep and slept soundly most of the day. She was evidently in a partially comatose condition a portion of the time, for her brother went there during the afternoon and tried to awaken her by shaking her, but failed.

The evidence leaves no reasonable doubt that from Saturday morning, November 24th, until her death, which occurred on Thursday, the 29th, she was entirely incompetent to transact any business whatever. She was very weak and exhausted, and failed rapidly. Although she would occasionally make an intelligent remark, she was for most of the time stupid or unconscious. Her daughter came to her on that Saturday forenoon, at about 11 o'clock, and remained with her until she died. When she first came her mother seemed to recognize her, but for a moment only, after which she gave no sign that she knew her daughter was with her. Her brother and his wife came to see her during the same Saturday forenoon, and tried to talk with her, but could obtain from her no response or recognition. There was no improvement thereafter at any time in her physical or mental condition, but the reverse. Dr. Seeber made his last professional visit to her on Tuesday, the 27th. He testified that she died of nervous prostration.

Most of the facts above stated are established by uncontradicted and most credible testimony; the remainder of them by an overwhelming preponderance of evidence. They are verities in the case, and no finding to the contrary can be upheld.

The deeds in controversy were executed by Mrs. Sparrowk during the evening of Friday, November 23d, some time between 9 o'clock and midnight. Besides Mr. and Mrs. Sparrowk, there were present at the time only Dr. Seeber, A. E. Joiner, who was a justice of the peace of Rock county, and *Mr.* and *Mrs. Dean.* The only witnesses who testify to what occurred at that time are Dr. Seeber, Mr. Joiner, and

*John Sparrowk.* Their testimony in that behalf details minutely the transactions of that evening. We shall not attempt here to state those transactions. It is conceded that such testimony, standing alone, is sufficient to support the finding of the circuit court that Mrs. Sparrowk then had sufficient mental capacity to make a valid conveyance of her property. But the testimony does not stand alone. It is inseparably connected with, and overshadowed by, the facts already detailed of the condition of Mrs. Sparrowk, both bodily and mentally, immediately before and immediately after the execution of the deeds, as well as from the time she was injured until she died.

The testimony is that on that Friday evening she gave directions to Dr. Seeber for preparing the deeds to *Dean*, and talked with apparent intelligence on the subject of the disposition of her property. Doubtless because she did so the learned circuit judge concluded she had sufficient capacity to make a valid conveyance. He evidently failed to give due and proper weight to her condition during the preceding week. Had he taken that into the account he would, we doubt not, have been impelled to the conclusion that the evidences of mental soundness manifested by Mrs. Sparrowk on that Friday night were apparent rather than real, and that whatever intelligence she then exhibited was but a fitful flash of her intellect struggling against the swift and close approach of almost entire insensibility and death, and was not evidence that she possessed sufficient mental ability to know what she was doing and the nature of the acts done. *Burnham v. Mitchell,* 34 Wis. 117; *Wright v. Jackson,* 59 Wis. 569. In judging rightly the quality of her acts and sayings on that Friday night, the facts must not be ignored that she was very aged and feeble at best; that she had been grievously and fatally injured; that for a week she had suffered most intense pain; that her nervous system had been shattered beyond restoration; that she had fever almost

constantly; that she was prostrated mentally to an extent that, although a lady of delicacy and refinement, she became indifferent to the exposure of her person, and to the consequences of obeying the calls of nature in her bed without preparation therefor; that, to quiet her nerves, or deaden her sense of pain, medicines were being frequently and constantly administered to her which no doubt induced a comatose condition, and must necessarily have seriously affected her mind; and that she was never fully conscious of anything after the morning following the execution of the deeds in controversy.

Giving to these facts their due and proper weight, we think the conclusion is inevitable that Mrs. Sparrowk was not, on the evening of Friday, November 23, 1883, mentally competent to make a valid conveyance of her property.

Three witnesses testified that at as many different times during the year 1883, and before she was hurt, Mrs. Sparrowk expressed an intention to give her farm to *Dean*, when she and her husband were through with it. Much stress is laid upon this testimony by counsel for defendants. Standing alone it has much significance. But there is evidence (and it is undisputed) that a year or two earlier, and when, presumably, her mental condition was stronger and better, she said that *George Dean* would never get her property. These conflicting statements on the subject leave her intentions, in respect to the disposition of her property, in doubt, and greatly impair, if they do not destroy, the value and force of her statements either way in that behalf.

We now proceed to consider the question of undue influence. What is said on this branch of the case is upon the hypothesis that Mrs. Sparrowk was competent to make a valid disposition of her property when she executed the deeds in controversy. It has already been said that Mrs. Sparrowk, although not the mother of *George E. Dean*, stood in the relation of a mother to him, and he acknowledged

that relation by calling her mother. She and her husband had reared him from his early youth as a son, and had cared for and educated him. He married their granddaughter, which naturally made their relations still closer. He lived with them nearly all the time both before and after his marriage. Children were born to *George* and his wife in the Sparrowk home, some of whom died there. No doubt the old people trusted him, confided in him, and relied upon him as though he were their son in fact, and this trust and confidence naturally increased as the infirmities of old age came upon them, rendering them more and more dependent upon the care of others. But there is nothing in the case which suggests that these old people were under any obligation to *George*, pecuniary or otherwise. The obligation, if any, would seem to be the other way. No reason appears why Mrs. Sparrowk should confer the bulk of her estate upon him, and thus exclude her daughter and grandchildren from sharing equally with him. Her relations with all of them were friendly, and she certainly manifested as much affection for them as for *George*. When the deeds in controversy were executed, *George*, under the direction of Mrs. Sparrowk, executed his note for $500 to her daughter *Mary M. Davis*, payable ten years after the death of *John Sparrowk;* also, his note to Jennie Bird, daughter of *Mary M. Davis*, for $500, payable five years after the death of said *John;* and a note for $25 to each of the other grandchildren, the plaintiffs, payable twelve years after his death. These notes were all drawn without interest. Mrs. Sparrowk left it entirely to *George* to fix the time of payment. The notes were delivered to Mr. Joiner by *Mr. Sparrowk*, with directions to retain them until his death, and then to deliver them to the payees. Mr. Joiner still retains them. The transaction, if upheld, practically disinherits her daughter and her other heirs. Assuming her mental competency, this strange and unnatural disposition of her property of

itself strongly suggests the existence of improper influences upon her mind. Moreover, after Mrs. Sparrowk was hurt *George* was frequently with her. He was there on the same day the deeds were executed. Early in the evening he went for Dr. Seeber (who had promised Mrs. Sparrowk to go there in the night, if sent for) and for Mr. Joiner. He told the justice that she intended to deed the farm to him. He returned to Sparrowk's and announced his intention of sitting up with Mrs. Sparrowk that night. Two of her grandsons were there for that purpose. On some trifling pretext he induced them to go with him to his place, and from there they went to their homes. These circumstances suggest an effort to keep the parties most interested in ignorance of the fact that Mrs. Sparrowk was about to convey her property to *George*.

We do not say that fraud and undue influence were proved affirmatively, but only that the circumstances suggest them. If the burden of proof is upon the plaintiffs to show such fraud or undue influence, probably we could not disturb the findings of the circuit court which negative their existence. But under the circumstances of this case the burden of proof is not upon the plaintiffs. Because Mrs. Sparrowk stood *in loco parentis* to *George*, and their relations to each other were those of trust and confidence, and because of the suspicious circumstances under which the conveyances were made, and the injustice which will be inflicted upon the heirs of the grantor if the conveyances are held valid, the law casts upon the grantee the burden of showing that the conveyances are untainted with undue influence or other fraud, but were the intelligent and deliberate act of the grantor. This rule is to protect the weak and unsuspicious from the cunning and fraud of those who stand in confidential relations to them, and has its foundation in good morals and sound public policy. The grantee has failed to satisfy the requirements of the rule, and the presumption

of injustice, fraud, and wrong stand against the convey-
ances, which he must remove before the court is authorized
to say that they are valid.    This he has not done, and for
that reason, also, his deeds must be canceled and held for
naught.

The rule of law above stated is quite elementary, and
has often been applied in similar cases both here and in
England.   It would be interesting to consider some of the
adjudications, and to comment upon them, to show how
firmly the rule is established, and how freely it has been
applied in cases like this.   But to do so would extend this
opinion to an undesirable length, and would serve no useful
purpose.   In addition to the cases cited to the rule in the
brief of counsel for the plaintiffs, we refer to the following
on the same subject:  *Worrall v. Bailey*, 3 Eastern Rep. 263;
*Greenfield's Estate*, 14 Pa. St. 489; *Miskey's Appeal*, 3 Penny-
packer, 409; *Turner v. Collins*, L. R. 7 Ch. App. 329; *Gandy
v. Macaulay*, L. R. 31 Ch. Div. 1.

It may be thought that it would be difficult for a grantee
who finds himself within the above rule to comply with it.
But if the conveyance is fair and honest, if it is in fact un-
tainted with fraud of any kind, that it is so is susceptible of
proof.   In the present case (assuming the mental compe-
tency of Mrs. Sparrowk to make a voluntary conveyance of
her land) had *George* given some of the parties. adversely
interested to him in the estate of Mrs. Sparrowk an oppor-
tunity to be present when the deeds were executed, or to
be represented there by some chosen friend or counsel, so
that they would have been cognizant of the whole transac-
tion, proof that he did so might go far to show that he
acted honestly and fairly in the matter.   It was his duty to
have done this, or something equivalent thereto, and he had
every opportunity to perform that duty.   Mrs. Sparrowk's
daughter, *Mrs. Davis*, lived in the same village with Dr.
Seeber, and he could easily have notified her when he went

there on Friday evening for the doctor and justice. *Mrs. Knaff*, one of the plaintiffs and a sister of *Mrs. Dean*, took care of her grandmother on Friday, and previously, and went to her home about dark on Friday evening. She could easily have been told what was about to be done, and invited to remain. The grandsons, who came to watch with their grandmother through Friday night, might have been retained. The nurse, Mrs. Meagher, was in the house, but retired about 9 or 10 o'clock, and before the doctor and justice arrived. She was a witness in the case, and is manifestly a woman of intelligence. She could easily have been called. How directly the opposite of the course here suggested was the conduct of *George*, has already been stated. If he now finds it difficult to purge his conveyances of the presumption of undue influence, or some other fraud which *prima facie* attaches to and vitiates them, it is because he so signally failed to do his plain duty, which no sensible, fair-minded man could have overlooked.

The judgment must be reversed on either of two grounds: (1) Because when Mrs. Sparrowk executed the conveyances in controversy she was not mentally competent to make a valid conveyance of her property; and (2) assuming that she was competent to do so, because of the relations existing between her and her grantee, *George E. Dean*, and of the other circumstances above stated, the burden is upon him to show that the conveyances are untainted with undue influence, or any fraud, which he has entirely failed to do.

*By the Court.*— Judgment reversed, and cause remanded with directions to the circuit court to give judgment for the plaintiffs for the relief demanded in the complaint.

A motion for a rehearing was denied May 15, 1886.

See *Leach v. Leach*, 65 Wis. 284, 294, where this case is cited.— REP.