PARRY and others, Respondents, vs. PARRY and others, Appellants.

*April 15 — June 17, 1891.*

*Vendor and purchaser of land: Rescission: Fraud: Concealment of facts: Confidential relations.*

> Where the purchaser had full knowledge of the situation and value of land, and the vendor resided at a great distance and had no adequate knowledge or means of knowledge on the subject, and the purchaser, without fully disclosing the material facts respecting such value, having secured the confidence of the vendor, thereby induced him to sell for much less than the real value, upon information given by the purchaser which was partial, misleading, or false as to such true value or any of such material facts, and the case is not barred by laches, the sale will be set aside at the option of the vendor. This is especially true where the parties are not on equal footing, and are so related to each other as naturally to inspire or secure confidence.

APPEAL from the Circuit Court for *Milwaukee* County.

It appears from record that John Parry died at Milwaukee, where he had long resided, October 6, 1885, seised in fee of real estate in that city, which was free from all liens and incumbrances, having a frontage on Michigan street of 120 feet, and depth on Jackson street of 80 feet, upon which four houses were situated: that said John Parry left no widow or children, but left him surviving *Robert Parry,* Edward Parry, and *Catherine Jones,* brothers and sister, and *Henry W. Parry,* nephew, all of North Wales, Great Britain, and Richard Parry of Milwaukee, and Evan Parry of Mankato, Minn., brothers.

This action was brought to set aside a deed from the plaintiffs, the said *Robert, Catherine,* and *Henry W.,* to the said Evan Parry, executed January 4, 1886, in consideration of $1,225 to each of said plaintiffs, aggregating the sum of $3,675. In addition to the facts stated, the court found as matters of fact, in effect, that said real estate was worth, October 6, 1885, upwards of $17,000, and would easily have sold for that amount in the market; that upon the death of said John Parry, the said Richard Parry was appointed the administrator of his estate upon the petition of the said Evan Parry, and that said Richard thereupon duly qualified, and entered upon the performance of his duty; that November 17, 1885, said real estate was appraised by the appraisers appointed for that purpose at $15,000, and the personal property of said deceased at $1,925.50; that said *Robert* and *Catherine* had never been in the United States, but had always lived in said North Wales; that said *Henry Parry* had never been in Milwaukee, but many years ago had been in Pennsylvania for a short time, otherwise he had always resided in said North Wales; that said Evan Parry came to Milwaukee the latter part of June, 1885, and remained there with his brother John about five weeks, taking care of him in his sickness;

that he also came to Milwaukee October 5, 1885, and was with his brother John when he died, and remained for a few days with his brother Richard, and that during the time he was so in Milwaukee he became thoroughly acquainted with the value of the real estate, and knew that said houses rented for $100 per month, or $1,200 per year; and that John left $1,900 in the bank, and, while there, petitioned for the appointment of Richard as such administrator.

The court also found, in effect, the correspondence stated in the opinion. The court also found that the plaintiffs relied upon the false and fraudulent statements made to them by said Evan in such correspondence, and were induced by his false and fraudulent statements and deceitful pretensions therein to sell and convey all of their interest in and to said real and personal property to said Evan for said sum of $3,675, and to execute their joint deed to him of said property, January 4, 1886; that upon receiving the letter from Richard in March, 1888, as to the condition of the estate, the plaintiffs immediately began an investigation, and finally discovered that they had been cheated and defrauded by said Evan out of most of their property, and thereupon, and in March, 1889, commenced this action to set aside said deed of January 4, 1886; that December 4, 1888, said Evan died testate at his residence in Mankato, Minn., seised of an undivided one-half of said real estate, so conveyed to him by the plaintiffs, in addition to what he took as such heir at law, and that the defendants in this action are his widow and children, who are also his heirs at law and devisees named in his will, and that the widow and one of said sons were appointed the administrators of his said estate; that September 27, 1890, said real estate was worth the sum of $30,000, and had, a short time before that date, been sold for that amount.

As conclusions of law the court found that the plaintiffs

were entitled to judgment setting aside said deed of January 4, 1886, to said Evan of all their interest in said real and personal estate left by said John Parry, deceased, and passing the title so conveyed back to the plaintiffs, and for the costs and disbursements of the action; that the plaintiffs pay into court, for the executors of said Evan Parry, deceased, the sum of $3,675, with interest thereon from January 4, 1886, within thirty days after the entry of said judgment, less the costs of this action to be taxed; and judgment therein was ordered accordingly. Judgment thereon was entered accordingly October 11, 1890. On November 8, 1890, the plaintiffs paid into court the sum of $4,707.54, as required by said judgment. From that judgment the defendants appeal.

For the appellants there were briefs by *Nath. Pereles & Sons*, attorneys, and *Thomas Hughes* and *Morris & Williams*, of counsel, and oral argument by *Thomas Hughes* and *Owen Morris.* They contended, *inter alia*, that the plaintiffs had failed to prove the fraud alleged, by such clear, decided, and satisfactory evidence as was necessary. *Farwell v. Hanchett*, 120 Ill. 573; *Lavasser v. Washburne*, 50 Wis. 200; *McCarthy v. White*, 21 Cal. 495; *Brayton v. Jones*, 5 Wis. 117; *Flint v. Jones*, id. 424; *Williams v. Starr*, id. 534; *Bumpus v. Bumpus*, 59 Mich. 95; *Collins v. Jackson*, 54 id. 186. Inadequacy of consideration was not sufficient. *Wood v. Boynton*, 64 Wis. 265; *Emonds v. Termehr*, 60 Iowa, 92; *Bickler v. Kendall*, 66 id. 703. The doctrine of *caveat emptor* applies. *Mamlock v. Fairbanks*, 46 Wis. 415; *State v. Green*, 7 id. 676; *Conner v. Welch*, 51 id. 431. To be fraud, the representation must be one of fact, and not one of opinion merely. *Buschman v. Codd*, 52 Md. 202; *Ætna Ins. Co. v. Reed*, 33 Ohio St. 283; 2 Smith's L. C. 1327.

For the respondents there was a brief by *Williams & May*, and oral argument by *A. B. May.* They argued, among other things, that where blood relatives are dealing

with regard to inheritances or distributive shares of estates coming to them jointly, they are under mutual obligations not merely to say or do nothing that is calculated to mislead, but to give such counsel as would presumably proceed from a third person who was equally concerned for all. *Million v. Taylor*, 38 Ark. 428 (where many cases are reviewed); *Gillispie v. Holland*, 40 id. 28. Until some inducement is shown, the law must always regard with suspicion an act by which a sister divests herself of a valuable interest in favor of a brother. *Boney v. Hollingsworth*, 23 Ala. 690. Where the purchaser resides near the property and has knowledge of its value, and the owner is a resident of another state and has no knowledge on that subject, statements of the purchaser representing the property to be greatly beneath its true value will be sufficient to avoid the deed given to such purchaser. *Morgan v. Dinges*, 23 Neb. 271; *Delorac v. Conna*, 29 id. 791; *Swimm v. Bush*, 23 Mich. 99; *Havlin v. Reed*, 5 S. W. Rep. (Ky.), 554.

The following opinion was filed May 5, 1891:

CASSODAY, J. The complaint is inartistic, but sufficient. It is claimed that the evidence fails to support the findings of false pretenses and representations made by Evan Parry, whereby the plaintiffs were induced to transfer and convey to him their interest in the estate of John Parry, deceased, for less than one third its value. It is very evident that Evan was present at the time of John's death; that he saw the real estate in question, and knew John had paid $11,500 for it some time before; that John had refused $4,000 for one fourth of it; that the personal property was of the value of at least $1,900. Evan had spent some five or six weeks with John just prior to his death, and must necessarily have known the relations then existing between John and Richard,— especially as both were living in the city of Milwaukee; that John moved to Richard's house a few months

before he died, and Richard had been doing John's business, including his banking, for twenty years before his death, and had bought the land in question for John, and had free access to all his papers. That Evan regarded their relations as perfectly friendly, and that Richard was honest, is demonstrated by his petitioning the county court for the appointment of Richard as the administrator of John's estate, in which he himself had a sixth interest. Evan, moreover, necessarily knew that neither of the plaintiffs nor his brother Edward, living, as they did, in Wales, had any reliable information respecting any of the things mentioned. His letter of October 13, 1885, to *Catherine*, in Wales, giving an account of John's sickness and death, and his care of him, and what it had cost him to do so, was well calculated to secure the confidence of the plaintiffs and prepare their minds for the one subsequently written by him. In that first letter he stated, in effect, that nobody could tell how much would be the value of the four houses when they were sold at auction, as they necessarily would be; that they might go for no more than half their value; that it would take a considerable expense to go through the county court. He then mentioned several items of expenses incurred, and adds: "You will get full account as things progress. This much this time."

October 30, 1885, Evan again wrote the sister, brothers, and nephew in Wales, to the effect that things were going to work the wrong way in Milwaukee; that one of the houses was vacant; that Richard thought of going to live in it; that it was not likely he would pay any rent; that he had a large and unruly family, and that they were likely to damage the house; that he did not think Richard would make any effort to settle without quarreling and lawing; that nothing would please him unless he got everything; that on that account he made an offer to them to buy him out or sell their shares to him; that the one who bought

out the others would have five shares, and could keep Richard so that he would have nothing to say; that the items of expenses named would aggregate $1,371 without mentioning what Richard might charge for his care of John; that there would not be much left of the $1,900 after paying the expenses; that if the houses should be sold at auction they would not bring near their value; that the times were poor; that John was not on speaking terms with Richard since a long time before he was taken sick, for the reason that Richard was getting drunk, as John had told him; that he would very much like to have them pull together with him, so that the property might not go between attorneys; that he hoped they would either buy or sell.

November 6, 1885, Evan wrote from Milwaukee to *Robert* in Wales to the effect that he had gone there to be at the hearing " on the claims that every one " had put in against the estate of John, including Richard's claim " for small favors he had done him for a period of time running back for six years, . . . the total amounting to $1,145, or 234 pounds; " that Richard was not wanting in shame; that Richard's unshamed face was apparent, as John had been half keeping him and his family through the years; that he had got an attorney, and was trying to stop Richard from charging so much; that Richard had postponed the trial until November 17, 1885, and possibly would postpone it many times again, in order to give him enough trouble. He then wrote to direct every letter to him at Mankato, and not at Milwaukee; that he was in trouble enough trying to get something from Richard; that it was exactly as he had expected; that Richard was an awful crank.

The plaintiffs wrote Evan under date of November 17, 1885, expressing a willingness to sell their respective shares at £250 each. Under date of December 11, 1885, Richard wrote the plaintiffs, and in effect informed them of his ap-

pointment as administrator, the appraisal of the property, and that he had been told by the attorney for the estate, whose address he gave them, that Evan was trying to buy them out, and advised them not to sell, as they would get twice as much when the property should be sold as he would give. There is what purports to be a copy of a translation of a letter from *Catherine* to Evan under date of February 17, 1886, but which *Catherine* denies ever having written or sent. The deed from the plaintiffs to Evan was executed January 4, 1886. Evan wrote to *Henry*, March 9, 1886, to the effect that Richard was saying that he had a letter from John, stating that all his property was given to him, Richard; that if Edward, who had declined to sell to him, and Richard "had their way, no one would get anything but them;" that he had received a letter from each of the plaintiffs, acknowledging the receipt of the consideration mentioned in the deed, and offering to sell back to them at the same price and expenses. From this it is manifest the trade was closed up prior to that date.

From the facts stated, it is very manifest that Evan suppressed or failed to inform the plaintiffs, or either of them, of several facts within his knowledge, and of which they were ignorant, indicating the true value of the property. On the contrary, his letters to them contained many false insinuations, pretenses, and representations bearing upon the value of the property, the attitude and disposition of Richard towards him and them, and his relation to John while living,— all tending to disparage the value of the property in their estimation, and to poison their minds against Richard. That Evan succeeded in his purpose is apparent from the fact that *Catherine* failed to answer Richard's letter of December 11, 1885, but sent the same to Evan. It was only when the plaintiffs received Richard's letter of March 12, 1888, that they began to realize

the true situation. That letter informed them, in effect, that the estate had been settled; that he had in his hands for disposition, in money, $1,682.13; and that, in his opinion, he would realize from the real estate from $15,000 to $18,000. About a year and a half afterwards the real estate appears to have been sold for $30,000.

The evidence is sufficient to support the findings of the court. Had Richard purchased the interest of the three plaintiffs in the estate upon such suppression of information and such false insinuations, pretenses, and representations as were made by Evan, it is very obvious that the transaction could not have been sustained. *Leach v. Leach,* 65 Wis. 284; *Davis v. Dean,* 66 Wis. 100. In such case, where the purchase is for an inadequate consideration, the burden is upon the trustee making the purchase to show that the *cestui que trust* knew at the time all the facts relating to the value of the property and his rights therein. *Ibid.* This is particularly illustrated in a late English case, referred to in one of the cases cited,— *Gandy v. Macaulay,* 31 Ch. Div. 1. The law placed Richard, as such administrator of John's estate, in such confidential relation to the plaintiffs and the other heirs of that estate. The plaintiffs, however, withheld all confidence and trust from Richard, and reposed the same in Evan, by reason of his letters to them. Having thus ingratiated himself into the confidence of the plaintiffs and supplanted Richard, was not Evan bound to disclose the facts as fully in respect to the property, in order to make a valid purchase, as Richard would have been obliged to do had he made the purchase?

The reasons for the rule mentioned are not confined to trustees and *cestuis que trustent,* but extend to other fiduciary relations. Thus, where an agent was requested to find a purchaser of a piece of land at a fixed price, and finally took it himself, it was held that, " when the sale is seasonably attacked, the burden is on the agent to show

that the bargain was fair and equitable; that he gave all the advice in his knowledge pertaining to the matter; and that there was no suppression or concealment which might have influenced the conduct of the principal." *Rochester v. Levering*, 104 Ind. 562. In sustaining a decree setting aside a judicial sale, and after citing numerous cases, Mr. Justice BRADLEY, speaking for the court, drew "the general conclusion that, if the inadequacy of price is so gross as to shock the conscience, or if, in addition to gross inadequacy, the purchaser has been guilty of any unfairness, or has taken any undue advantage, or if the owner of the property or party interested in it has been for any other reason misled or surprised, then the sale will be regarded as fraudulent and void, or the party injured will be permitted to redeem the property sold. Great inadequacy requires only slight circumstances of unfairness in the conduct of the party benefited by the sale to raise the presumption of fraud." *Graffam v. Burgess*, 117 U. S. 192. In a later case it was held by the same court that, "although silence as to a material fact is not necessarily, as matter of law, equivalent to a false representation, yet concealment or suppression by either party to a contract of sale, with intent to deceive, of a material fact which he is in good faith bound to disclose, is evidence of and equivalent to a false representation." *Stewart v. Cattle Ranche Co.* 128 U. S. 383. "Where one of the parties to a negotiation induces the other to contract on the faith of representations, any one of which has been untrue, the whole contract is to be considered as having been obtained fraudulently." *Reynell v. Sprye*, 1 De Gex, M. & G. 660.

The authorities seem to warrant the proposition that where a purchaser has full knowledge of the situation and value of land, and the owner resides at a great distance therefrom and has no adequate knowledge or means of knowledge on the subject, and the purchaser, without fully

disclosing the material facts respecting such value, having or securing the confidence of the owner, thereby induces him to sell for much less than the real value, upon information given to him by the former, which information is partial, misleading, and false as to such true value or any of such material facts, and the case is not barred by laches, the sale will be set aside at the option of such vendor. *Swimm v. Bush,* 23 Mich. 99; *Grim v. Byrd,* 32 Grat. 293; *Rorer Iron Co. v. Trout,* 83 Va. 397, 5 Am. St. Rep. 285. This is especially true where the parties to the contract are not on equal footing, and are so related to each other as naturally to inspire or secure confidence. *Boney v. Hollingsworth,* 23 Ala. 690; *Million v. Taylor,* 38 Ark. 428; *Gillispie v. Holland,* 40 Ark. 28; *Davis v. Dean,* 66 Wis. 100. The law gives to the defendants no better right to the estate of John than was possessed by Evan, under whom they claim.

*By the Court.*— The judgment of the circuit court is affirmed.

A motion for a rehearing was denied June 17, 1891.