(125 N. W. 560.)

---

SOLOMON J. LILAND v. A. K. TWETO.

Opinion filed March 18, 1910.

**Statement of Case — Motion to Strike Out — Missing Exhibits.**

1. This case is in the Supreme Court for trial de novo on all
the evidence taken in the trial court. Respondent submits a motion
to strike out appellant's statement of the case and abstract, on the
ground that Exhibits 40 and 67, shown by the abstract to have been
referred to by witnesses, are not present in this court. The certi-
ficate of the judge of the district court shows these exhibits were
present and included in the record certified to the Supreme Court, but
not printed in the abstract because of the inconvenience of repro-
ducing them. After full consideration of the entire record, this court
is able to say that the presence of neither of said exhibits is material
or necessary to, or would in any manner affect or influence, its de-
cision of the case. *Held*, under these conditions, the motion to strike
out the statement of the case and abstract will not be granted.

**Exchange of Property — Confidential Relations.**

2. While no exact definition of the terms "confidential relations"
and "relations of confidence" applicable in all cases can be given, such
relations exist when the parties to a transaction do not meet upon
an equality, one having a full knowledge of the subject of traffic,
and the other but slight knowledge, and no ability to acquire full
knowledge, and the innocent person relies on and places confidence
in the representations made by the other party to the transaction.

**Confidential Relations — Fraud — Rescission of Contract.**

3. When relations of confidence exist between the parties to an
exchange of property, one of whom has full knowledge of the char-
acter and condition of the property, and the other but slight knowl-
edge, and no means of obtaining full knowledge, representations as

to value which under most circumstances would·only amount to expressions of opinion, if made knowing them to be false by the party making them, and with an intent to deceive the other party to the transaction, constitute such fraudulent misrepresentation as may warrant a rescission of the contract or transaction.

### Fraud — Rescission of Contract.

4. In an action to rescind a conveyance of real estate brought by the grantor against the grantee, where the consideration received was stock in a corporation the character and condition and value of whose assets were known only to the grantee, and cannot be ascertained by the grantor, the suggestion as a fact that the stock was of a certain value, such suggestion being made to induce the trade, and· without which the transaction would not have been consummated, and made by one who in the nature of things must have known it to be untrue, constitute fraud which may entitle the grantor to a res. cission of the transfer.

### Contracts — Rescission — Fraud — Suppression of Truth.

5. Under the circumstances and conditions described in the foregoing numbers of this syllabus, the failure of the owner of the stock to disclose to the party to whom he transferred it,. as a consideration for a deed to real estate, the insolvent condition of the corporation by which such stock was issued, he having knowledge of its condition, is a supression of the truth which may entitle the grantor to a rescission of his deed.

### Contracts — Rescission — Ratification—Fraud.

6. To work a ratification of a contract or transfer induced by fraud which will defeat the innocent party's right to a rescission, the innocent party must have done some act, after he acquired full knowledge of the fraud, inconsistent with a rescission or rendering it impossible to place the other party in statu quo.

### Contracts — Impossibility of Restitution.

7. The rule that impossibility of restitution is a defense to an action for a rescission does not apply when complete restitution to the statu quo has been rendered impossible by the· act of the defendant.

### Cancellation of Instruments — Evidence — Burden of Proof.

8. The burden of proving knowledge of·facts giving rise to the right to rescind, and of the time of acquiring such knowledge, rests on the defendant.

### Contracts — Ratification — Fraud.

9. The plaintiff had some conversation with a third party regarding the purchase by the third party of stock held by the plaintiff after plaintiff acquired knowledge of his right to rescind. The third party

made an offer to buy, which was not accepted. *Held,* that this did not work a ratification of the transfer complained of as fraudulent.

Appeal from District Court, Richland County; *Allen,* J.

Action by Solomon Liland against A. K. Tweto. Judgment for defendant, and plaintiff appeals.

Reversed, with directions.

*Engerud, Holt & Frame and W. S. Lauder,* for Appellant.

Producing a false impression may be done by words, acts, or concealment or suppression. Stewart v. Wyoming Ranche Co., 128 U. S., 383, Paddock v. Strobridge, 29 Vt., 470; Howard v. Gould, 28 Vt. 523; McAdams v. Cates, 24 Mo., 223; Marsh v. Webber, 13 Minn., 109, (Gil. 99.); Jeffreys v. Bigelow, 13 Wend., 519; Rawdons v. Blatchford, 1 Sandf. Ch. 344; Brown v. Gray, 72 Am. Dec. 563; Rheem v. Wheel Co., 33 Pa. St., 358; Newell v. Randall 19 N. W. 972; Rosenbaum v. U. S. Credit Co., 44 Atl. 966; Brue v. Ruler, 17 Eng. Com. L., 700; Hill v. Gray, 2 Eng. Com. L., 167; Mellish v. Motteaux, Peake's Cases, 115, Burns v. Dockray, 30 N. E. 551; Busch v. Wilcox, 46 N. W. 940; Hanson v. Edgerly, 9 Foster, 343, 359; Englehardt v. Clanton, (Ala.), 3 So., 680; Dowling v. Lawrence, 16 N. W. 552; Downing v. Dearborn, 1 Atl., 407; Mallory v. Leach, 35 Vt. 156; 2 Kent's Com. 482; I Story's Eq. Jur., Sec. 208-216; Pomeroy Eq. Jus. Sec. 901, page 1611 and note 2; Bank v. Baxter, 31 Vt., 101.

*Purcell & Divet, and Chas. E. Wolfe,* for Respondent.

Mere expression of opinion, though false, is not fraudulent Krause v. Cook, 108 N. W. 83; Fargo Gas & Coke Co. v. Fargo Gas & Elec. Co., 4 N. D. 219, 59 N. W. 1066; Pasley v. Freeman, 3 T. R. 51; 2 Smith's Leading Cases, 1300, (Collin's 9th Ed.) Mooney v. Miller, 102 Mass. 217; Manning v. Albee, 11 Allen 520; Gordon v. Parmellee et al., 2 Allen, 212; Credell v. Swindell, 63 N. C. 305; Wise v. Fuller, 29 N. J. Eq. 257; Wilkinson v. Clausen, 29 Minn. 91; Ellis v. Andrews, 56 N. Y. 83, 15 Am. Rep. 379; Markel v. Moudy, 11 Neb. 213; Dowagiac Mfg. Co. v. Mahon & Robinson, 13 N. D. 517; Neidefer v. Chastain, 36 Am. Rep. 198; James Music Co. v. Bridge, 114 N. W. 1108; French v. Ryan et al., 62 N. W. 1016; Hubbell v. Meigs, 50 N. Y. 480; Gordon v. Butler, 105 U. S. 553, 26 L. Ed. 1166; Homer v. Perkins, 124 Mass. 431; Kimball v. Bangs, 11 N. E. 113, and note.

A party defrauded may tender back what he received and recover what he gave, or retain what he received and sue for dam-

ages. 20 Cyc. 87; Westerfeld v. New York Life Ins Co., 58 Pac. 92; Wilson v. Nichols et al., 43 Atl. 1052; Wabash Valley Protective Union v. James, 35 N. E. 119; Teachout v. Van Hoesen, 76 Ia., 113, 14 Am. St. Rep. 206, 40 N. W. 96; Hargadine-McKittrick Dry Goods Co. v. Swofford Bros. Dry Goods Co., 63 Pac. 281; Weaver v. Shriver, 30 Atl. 188; Gilchrist v. Manning, 19 N. W. 959; Minazek' v. Libera et al., 86 N. W. 100; Whitney v. Allaire, 1 N. Y. 305; Wilson v. New United States Cattle Ranch Co., 73 Fed. 994; Am. Bldg. & Loan Ass'n v. Rainbolt, 67 N. W. 493; Friend Bros. Clothing Co. v. Hulbert, 73 N. W. 784; Moore v. Howe et al., 87 N. W. 750; Smeesters v. Schroeders, 101 N. W. 363.

Unless statement of case has all the exhibits enumerated therein, or officially identified as a part thereof, Supreme Court cannot try the case anew. Eakin v. Campbell, 10 N. D. 416, 87 N. W. 991; Bank v. Davis, 8 N. D. 83, 76 N. W. 998; U. S. Savings & Loan Co. v. McLeod, 10 N. D. 111, 86 N. W. 110; Edmonson v. White, 8 N. D. 72, 76 N. W. 986; Otto Gas Engine Works v. Knerr, 7 N. D. 195, 73 N. W. 87; State ex rel. Wiles v. Heinrich, 11 N. D. 31, 88 N. W. 734; Marck v. Soo Railway 15 N. D. 86; State v. School District No. 50 of Barnes Co., (N. D.) 120 N. W. 555; National Cash Register Co. v. Wilson, 9 N. D. 112, 81 N. W. 285; Geils v. Fluegel, 10 N. D. 211, 86 N. W. 712; Iowa Business Men's Bldg. & Loan Ass'n v. Fitch, 120 N. W. 694; Kipp v. Angell, 10 N. D. 199, 86 N. W. 706; Littel v. Phinney et al., 10 N. D. 351, 87 N. W. 593; Teinen et al v. Lally, 10 N. D., 153, 86 N. W. 356; Schmidt v. Beiseker, 19 N. D. 35; 120 N. W. 1096; Berteson v. Ehr, (N. D.) 116 N. W. 335; O'Keefe v. Beecher, 117 N. W. 353 (N. D.)

SPALDING, J. This is a suit in equity, commenced and tried in the district court of Richland county to obtain a judgment rescinding an exchange of plaintiff's farm and personal property for defendant's shares of stock in the United Farmers' & Merchants' Exchange Company of Abercrombie, a corporation. Defendant had judgment, from which plaintiff appeals, demanding a new trial of the entire case.

Epitomized, the pleadings state the following facts: That on the 15th day of November, 1906, plaintiff was the owner of the real estate described, being two half sections of land in Richland county, and of certain personal property consisting of horses, farming

utensils, and cattle; that the value of the land was about $30,000 and of the personal property about $2,000, and that the land was incumbered to the amount of about $14,000; that the defendant was at that time the owner of 1,726 shares of the capital stock of the corporation named, and that such shares were of par value of $10 each; that the plaintiff was an old man, not conversant with the English language, had been a farmer all his life, with no business experience otherwise than as a farmer; that the plaintiff had been intimately acquainted with defendant for many years, and had implicit confidence in defendant's honesty, business ability, and friendship, and for that reason reposed great confidence in his advice and representations relating to business matters; that the defendant, when the transaction involved occurred, well knew the facts as to plaintiff's confidence in him, his advice, and statements; that on the 15th day of November, 1906, with intent to deceive plaintiff and induce him to sell and convey to defendant the real estate and personal property mentioned, defendant wrongfully and fraudulently stated and represented to plaintiff that said corporation was in a very prosperous and flourishing financial condition, and doing a large and profitable business; that its shares of stock were worth at least $12 per share; that it had been earning large profits, so that a dividend of at least 7 per cent. on the paid-up capital stock would be declared and paid at the next annual meeting of the corporation to be held in January thereafter, and that defendant requested and advised plaintiff to exchange his property for stock in said corporation; that plaintiff was wholly ignorant of the financial condition of such corporation, and by reason of his implicit confidence in the honesty, business ability, and friendship of defendant in general he implicitly believed and relied upon such statements and representations and advice, and was thereby induced to sell and convey to defendant such real estate and personal property for the shares of stock mentioned and owned by defendant, and in pursuance of such agreement, and to carry it into effect executed and delivered a deed of conveyance, conveying to defendant the land described, subject to incumbrances against the same, and also delivered possession of the personal property in controversy and possession of the lands, and that defendant assigned and transferred the shares of stock referred to, to plaintiff; that at the time defendant made the false and fraudulent statements set forth he well knew said statements were false

and untrue, and that plaintiff would and did rely thereon, and that said statements were false and untrue in that such corporation, at that time, was in an insolvent condition, unable to pay its debts. did not have sufficient property to pay its obligations, and was in fact in a bankrupt condition, and would not be able to, and the officers and directors did not expect said corporation would or could pay any dividend to its stockholders, and that the shares so transferred were of no value whatsoever; that plaintiff did not. discover the falsity of said representation and the deceit practiced upon him by defendant until immediately before the commencement of this action; that he is ready, willing, and able, and offers, to restore and reassign defendant all such shares of stock and brings the same into court and offers to assign them to defendant. The complaint then alleges the sale by defendant of the personal property involved for the sum of $1,900, and the payment by defendant of certain indebtedness, and that plaintiff is ready, able, and willing to return to defendant the sums of money paid out by him on account of the transaction, and to comply with all other conditions which the court may impose, in order to restore defendant to the condition in which he was before the exchange was made, and he prays for judgment requiring a reconveyance of the lands and an accounting as to the personal property and an adjustment of the amount received therefrom by the defendant and the amount paid out by the defendant.

The answer is a general denial, except as to matters admitted, and admits the ownership, but denies that the real estate was of the value of $30,000.; admits the existence of the corporation and defendant's ownership of the 1,726 shares of the par value of $10 per share and the exchange of the property and the incumbrances upon the real estate; alleges that defendant assumed and agreed to pay the same, and has paid about $1,040 thereon. The answer further alleges that at the time of such transaction the stock transferred was of the actual value of $10 per share, and that the corporation was solvent and possessed of resources largely in excess of its liabilities; but that after the transaction between these parties such corporation became involved in financial difficulties, that though solvent, it was unable to meet its obligations as they became due, and as a result made a deed of assignment of all its property for the benefit of its creditors, and was by such act involved in litigation in the bankruptcy courts of the United States,

its property placed in the hands of a receiver, and the value of all of the stock in such corporation greatly depreciated or destroyed; that the making of the deed of assignment was participated in by the plaintiff as a director and stockholder, and advised and countenanced by him in opposition to the express wish of defendant, and that by reason of the act of the corporation so participated in by plaintiff the value of the stock transferred has been greatly depreciated or destroyed without fault on the part of defendant, and that a transfer of such stock to him would not restore him to the position he occupied in reference thereto at the time of the exchange; that at the time such deed of assignment was made plaintiff was fully advised of the financial condition of the corporation, and of its exact condition in relation to its assets and liabilities, and of the truthfulness or falsity of any representations made by defendant as to the value of such stock, and that with such knowledge plaintiff acted as a director and stockholder, and as the owner of the shares transferred and thereby ratified and affirmed the transaction between these parties; that after the transfer of the stock such corporation incurred large liabilities in addition to those existing on the 15th of November, 1906, and disposed of large amounts of property owned by it at that time, and that by reason of these facts the proportion of liabilities and assets was greatly changed before the commencement of this action, increasing the proportion of liabilities to assets, and thereby diminishing greatly the value of the stock.

The testimony taken is very voluminous. More than 1,000 pages of printed evidence have been carefully read, and many books of account belonging to the corporation, introduced as exhibits for the purpose of showing its condition at the time the transaction in question took place, have been examined. We are first met by a motion to strike out appellant's statement of the case and abstract. As originally submitted, it was based on numerous grounds which have been reduced by respondent's supplemental brief to two. It is contended that the motion should be granted by reason of the absence from the record now in this court of Exhibits 40 and 67, shown by the abstract to have been introduced in evidence at the trial in the lower court, and to have been referred to by witnesses in testifying in material particulars. The certificate of the judge who heard the case in district court shows that these exhibits were present and included in the record certified to this court. Neither

of them is printed in the abstract because of the inconvenience of reproducing them. Under the statute we are required to try this suit anew on the evidence submitted in the district court. It is therefore manifest that if any material part of such evidence is wanting, we shall be unable to review it and arrive at a conclusion founded upon the whole case. Numerous authorities are cited where motions have been granted because exhibits were not certified to this court by the trial court, or where they were missing when the record reached the appellate court. The first class of authorities is not in point. Those of the second class may or may not be in point, depending on the nature of the exhibits, and a consideration of them being essential to a determination of the controversy. In the present instance one of the exhibits is a plat of a town site known as Sandoun. A careful examination of the record discloses that its presence could have no effect whatever upon a consideration of the case upon the merits. It appears to have been used solely for the purpose of locating one tract of land, indirectly in question, with relation to the town site. The testimony here shows all that is necessary to take into consideration in relation to it, and we can say affirmatively that the presence of the plat would furnish no material aid to this court. The other exhibit is an inventory taken of a part of the corporation's stock of merchandise some time after the transaction in question occurred. It was introduced to show that the clothing included in the stock was of less value than claimed by the respondent. Its admission was strenuously opposed on numerous grounds by respondent's counsel. Under our system the trial court could not pass upon its admissibility, but had to receive it. Appellant's counsel now concede that the objections were well taken, and that the testimony of the witnesses who took the inventory of the clothing contained in the exhibit is inadmissible. We shall not pass upon the question whether this objection and admission would cure its loss from the record. The record discloses an inventory and valuation of the clothing, submitted by the respondent, and the value is so small a part of the total amount involved that any difference shown by the missing exhibit would not materially affect our conclusions; hence we are able to give the respondent the full benefit of his valuation upon the clothing in question, without in any manner changing the result of our deliberations. For these reasons the motion is denied. This is done without establishing any rule that the loss of

exhibits in an action to be tried de novo in this court may not furnish a ground for granting similar motions when it is apparent that their presence is essential to a determination of the controversy on its merits. The trial court having certified up the exhibits, their absence does not deprive this court of jurisdiction.

On the first witness for plaintiff being sworn defendant objected to the introduction of any evidence on the ground that the complaint did not state facts sufficient to constitute a cause of action, in that the facts alleged did not show fraud on the part of the defendant, and that no facts were alleged to establish confidential or trust relations between the parties, and because the facts alleged as tending to show fraud are not alleged to have been untrue. The trial court failed to rule on this motion. We discover no merit in it. Our discussion of the facts involved will disclose our reasons without extending them at this time.

The learned trial court found, so far as material to a determination of this appeal, that the land exchanged by appellant was of the value of about $30,000, and incumbered by mortgages aggregating about $14,000; that the personal property was of the value of about $2,000; and that at the time of the trade or exchange there was no relation of trust or confidence of any kind existing between the plaintiff and the defendant; and that there had never been dealings or relations between them of such character as to justify the plaintiff in reposing any trust or confidence in the defendant; and that there was nothing in the relations or dealings of said parties that would or did induce any belief or trust on the part of the plaintiff in the defendant; and that in making such trade each traded with the other upon an ordinary business footing; and that there was nothing in the relations or former dealings between the parties to lead the defendant to believe that plaintiff was dealing with him in reliance upon any trust or confidence entertained by plaintiff in defendant; and that the defendant was ignorant of any such trust or confidence, and that at the time of making the exchange defendant did nothing to prevent or dissuade plaintiff from fully investigating and learning the character and value of the property transferred to him by defendant, but, on the contrary, encouraged him to investigate its value and character; and that plaintiff relied upon his own knowledge and judgment of the value and character of the property received by him; and that the allegations of the complaint of false and fraudulent concealment and

misrepresentations were not sustained by the evidence; and that no fraud or deceit was practiced upon plaintiff by defendant to induce him to make the trade. No finding was made on the financial condition of the company.

We now proceed to consider the case upon its merits. We cannot review in extenso the great mass of evidence before us without unduly extending this opinion, and this would serve no useful purpose. The plaintiff was born in Norway. At the time of the trial he had been in this country 21 years, and was 66 years old. He received a little schooling in Norway, but none in arithmetic and none in the English language, and cannot read or write English, and his understanding of the English language in conversation is very meager. He had never been in business or done anything except to farm. He knew nothing about bookkeeping, or how to conduct an investigation of complex book accounts. He had known the defendant for some years, and had done some business with him, but their social relations had not been intimate. He had reared eight children, of whom one son 21, and another 16, years of age were still at home, but neither of these sons desired to remain there and engage in farming. The wife of the plaintiff was 62 years of age. He had a large amount of taxes to pay each year, as well as interest, and felt that they were getting old and unable to handle the farm business any longer. Those were the reasons for his desiring to trade his land for other property which could be handled more easily, and which would give him an income on which he and his wife could be supported. After the corporation known as the United Farmers' & Merchants' Exchange Company was organized he took 77 shares of its capital stock of the par value of $770, and was paid dividends thereon for the years 1904 and 1905 pursuant to the action of the directors at the annual meetings held in 1905 and 1906. He had attended these annual meetings and heard the condensed annual statements of the company's assets and liabilities read by Tweto, but testifies that they were understood only in small part by him, and we are satisfied from the evidence that, while they may have been read both in English and Norwegian, he was unable to comprehend their import fully. The defendant Tweto has resided in Abercrombie since 1880, and during that time has been engaged in different lines of business, such as farming, dealing in farm machinery, grain, running an elevator, and banking, and at the time this suit was brought was the presi-

dent of five or six banks, one of them in Abercrombie, and most of the others in small villages not far distant from Abercrombie. He was engaged in business on the site of the elevator and store of the company prior to the organization thereof. In 1900 his buildings and business were destroyed by fire, after which he rebuilt and re-engaged in the machinery business. In 1903 he organized the corporation referred to, and transferred to it his business site. lots, and buildings, together with his stock of machinery, etc., and took $15,000 worth of stock therefor. This exchange was not made directly, but Tweto gave his check on the bank for the stock, and the company gave its check for the property received, and it would appear that the checks were offset in the bank, the purchase price of the business and property being the same amount as that for the stock in the corporation. After the organization of the company, and before the exchange of the property with Liland, several tracts of land owned or purchased by Tweto were by him transferred to the corporation; that is, the equities in such lands were transferred, as we believe none of them were clear of incumbrances. He received cash or stock, or both, and on several of these exchanges made a considerable profit. He was at all times the president and manager of the corporation until the 8th day of March, 1907 and in fact was the corporation. Different amounts of stock were owned by several people, but Tweto was the head and front of the organization. He dictated its policies and all its principal transactions. The very numerous exchanges between him and the corporation were conducted between Tweto as an individual on one side and Tweto as president and manager of the company on the other. We are led to believe by the record that whenever he saw an opportunity to get property and turn it over to the company at a profit, or when he had property which he desired to dispose of, he transferred it to the corporation. It thus became a sort of dumping ground for his equities in real estate.

Liland, as we have shown, had a desire to retire from farming, and to invest in something which would give him a safe income during the remaining years of his life. He heard that one of the banks in Abercrombie was contemplating an increase of its capital stock, and spoke to one of the officers of the bank with reference to the possibility of exchanging his farm for some of the stock of that bank, but was informed that it could not be done. Tweto was in the bank at the time and overheard this conversation. This led

to a conversation between the two as to an exchange of Liland's land for stock in Tweto's corporation, and after two or three weeks' negotiations the transfer set out in the pleadings was consummated. It appears that there was about $12,000 stock in the corporation still unsold and known as treasury stock, and the question arose with reference to which stock would be best for Liland to take. Tweto explained to Liland that if he took treasury stock, he would not draw any dividends for the year 1906, while if he took his stock, he would be entitled to dividends, and Liland told him that the dividends were what he was after. Other representations which will be referred to later were made regarding the stock and the corporation.

While, as we have said, the trial court made no finding as to the solvency of the corporation, we deem that fact of prime importance, and the evidence shows beyond controversy that the corporation, at the time the exchange of properties was consummated, was not only insolvent in the statutory sense that it was unable to pay its obligations in the due course of business, but that its property was of such a nature and in such condition that on the sale of the whole thereof within any reasonable period of time, and the application of the proceeds to the extinguishment of its indebtedness, little would have been left for the stockholders. According to respondent's showing, taken from the statement he submitted at the annual meeting January 17, 1907, the assets aggregated $87,988.42, while the liabilities, exclusive of the capital stock, reached $49,718.42, and including the capital stock $87,988.42. These liabilities embraced bills payable of nearly $25,000, accounts payable to wholesale houses over $18,000, surplus, $3,964.39, and 1906 profits, $1,879.82, but did not include a large amount of liabilities in the shape of mortgages on the real estate and as indorser on bills receivable discounted at the bank. We are unable to determine the exact amount of these items. It is sufficient to say that they aggregate a large sum. On the other hand the gross value of the real estate was not included in the assets; the method pursued being to count the value of the equities in the real estate as an asset, and to disregard the mortgages and indorsements as liabilities. The record shows that the company had to take up its discounted paper in large amounts. In the assets was included the company's main building, in which it did business at Abercrombie, at over $14,000 valuation. Several witnesses testi-

fied as to its value, and, while conceding that it would cost more than that to construct it, they almost uniformly agreed that it was of small value as compared with its cost, by reason of its being larger than the requirements of the business demanded in a village as small as Abercrombie. Also included in the resources were numerous accounts for repairs, additions, and changes in buildings which added nothing to their salable value, but served to pad the statement of assets. Lands were included at excessive values, and large expense items were added to the values of a number of items. We mention these facts only as showing the method pursued by the company in making its financial showing to stockholders or others, and on which it is claimed by respondent appellant had every opportunity to inform himself. It is clear that the statements of assets were padded; that many of them were not readily salable, and practically none at figures even approximating those of the statements. Many other items of a similar nature might be mentioned.

Section 5293, Rev. Codes 1905, so far as pertinent to this inquiry, reads as follows: "Actual fraud within the meaning of this chapter consists in any of the following acts committed by a party to the contract, or with his connivance, with intent to deceive another party thereto or to induce him to enter into the contract: (1) The suggestion as a fact of that which is not true by one who does not believe it to be true. (2) The suppression of that which is true by one having knowledge or belief of the fact." "(5) Any other act fitted to deceive." It is urged by the appellant that the representations made by respondent in the course of the negotiations of the parties, not only constituted positive false and fraudulent representations as to values and the condition of the company and its ability to realize profits and pay dividends, entitling him to rescind, but that, giving the respondent the benefit of the least weight that can properly be attached to such representations, they operated as suggesting as a fact that which was not true, and that respondent did not believe them to be true. It is also maintained that it was incumbent upon the respondent to state the facts within his knowledge regarding the financial condition of the corporation to appellant, and that his failure to do so was a suppression of that which was true by one having knowledge or belief of the fact. It is clear that the parties did not meet upon an equality. Tweto was the corporation. True, others were in its employ as

salesmen and bookkeepers, and in other corresponding vocations, but everything was under Tweto's direction. He made the trades by which all the property of the corporation was acquired. He knew the condition of the accounts, and was familiar with the methods of bookkeeping. He knew the character of its assets and liabilities. He also knew, not only that Liland was incompetent to ascertain from its books the character of its resources and liabilities, their value and amount, but that they were so complex, so diverse in character, and of such a nature that no man, unless one of more than ordinary intelligence, could in any reasonable length of time determine by his own exertions the actual condition of the corporation. We cannot go into details on this subject, but the record is clear. Liland explained to Tweto his reasons for desiring to dispose of his farm, and why he thought stock in a corporation would prove a satisfactory investment. Liland testified that Tweto told him that the stock was worth $12 per share. Tweto's testimony is to the effect that he told him it was worth $10 per share, and as much added as the surplus earnings showed on the statements. Considerable discussion has been had as to this conflict in their testimony. We deem it wholly immaterial. On Tweto's version he misrepresented the value of the stock. Other evidence was submitted showing further representations by Tweto as to the corporation being in good condition financially. We are convinced that, taking the record as to their negotiations and Tweto's statements as a whole, the effect of Tweto's statements was to lead Liland to believe that the corporation was in good working condition, and in such shape that it could pay dividends which would enable him and his wife to maintain themselves, and that he knew the contrary to be the fact. We are satisfied that Tweto made such statements knowing that Liland so understood them, and intending that he should draw such inference.

The learned trial judge, as we have stated, made no finding regarding the condition of the corporation but found that relations of confidence did not exist between the parties. It is apparent that the findings were so made because that court misinterpreted the meaning of relations of confidence in such transactions, and found that the statements of Tweto were mere expressions of opinion, in the absence of such relations between the parties, not amounting to misrepresentations or fraud. No exact definition can be given as to what is necessary in all cases of this kind to create such relations,

but the trial court evidently had in mind that a marked degree of friendship or close and intimate business relations must have existed for a time between the parties to establish such conditions. This is not the meaning that should be applied in the case at bar. They rather mean that the parties do not meet upon an equality by reason of the extensive knowledge and information of one of them, and the lack of such knowledge and information, and of the ability to acquire it, of the other party to the trade, and that either from the nature of the transaction or surroundings the complainant was compelled to and did place confidence in and rely on the representations made by the respondent. In the instant case, from what we have said, it is clear that Liland did repose confidence in and rely on Tweto's representations, and Tweto's knowledge of his purpose in disposing of his land and investing in the stock. He could not do otherwise if the trade was made, and the statements amounted to representations of facts which were the inducement to Liland to make the exchange. Had he known of the true condition of the corporation, he would not have engaged in the transaction. Zimmerman v. Bitner, 79 Md. 115, 28 Atl. 820; Parry v. Parry, 80 Wis. 123, 48 N. W. 654; Carlton v. Hulett, 49 Minn. 308, 51 N. W. 1053; Goodrich v. Smith, 87 Mich. 1, 49 N. W. 469.

In 2 Addison on Torts, section 1186, it is said: "If the representation is as to matter not equally open to both parties, it may be said to be a statement of fact; but, if it is a matter that rests entirely in the judgment of the person making it, and the means of information upon which a fair judgment can be predicated are equally open to both parties, and there is no artifice or fraud used to prevent the person to be affected thereby from making an examination and forming a judgment for himself, the representation is a mere expression of opinion, and does not support an action for fraud."

In French v. Ryan et al., 104 Mich. 625, 62 N. W. 1016, the Supreme Court of Michigan says: "Representations of the probable earnings of the enterprise were not necessarily fraudulent. They may be mere expressions of opinion, made in good faith, and in such case cannot be made the basis of a recovery; but if made in bad faith, by one who is possessed of superior knowledge respecting such matters, with design to deceive and mislead, the party making them must respond."

This court said in Dowagiac Mfg. Co. v. Mahon & Robinson, 13 N. D. 517, 101 N. W. 905: "There are cases sustaining cancellation of contracts entered into in reliance on opinions, but the parties were not dealing as equals, or one of them was induced to forbear making inquiry as to the facts. The party injured was not the equal of the other mentally or in experience, or placed confidence in such opinion as coming from one who was his superior and one in whom he had special confidence."

Chilson v. Houston, 9 N. D. 498, 84 N. W. 354, related to representations made regarding the value of a promissory note and the solvency of the maker. The court says: "The question which is decisive of this point is this: Did plaintiff rely and act upon these statements to his damage? Whether he relied upon them is not a question of law but a question of fact purely. The question is not whether the false statements should have induced plaintiff to part with his property, but is this, did they induce him to do so? * * * The misrepresentations must be the operative cause of the transfer. * * * The evidence shows that the plaintiff parted with his land for this note. He supposed he was getting the value of his equity in the farm, a good and collectible note. He knew of its value only from defendant's statements. In estimating its value he had nothing else to rely upon and under these conditions it is absurd to say that the jury were not justified in concluding that he did rely upon what defendant told him." This language is as applicable in the present case as it was where used.

In Fargo Gas & Coke Co. v. Fargo Gas & Electric Co., 4 N. D. 219, 59 N. W. 1066, 37 L. R. A. 593, a defense was made on the ground of false and fraudulent representations, which consisted mainly of representations regarding the earning capacity of the plant sold, and the defendant relied chiefly upon its earning capacity in making the purchase, and was induced to believe its net annual earnings would equal 10 per cent of the purchase price, because its net earnings during the previous year had equaled that. The court charged the jury in effect that defendant did not have the right implicitly to rely upon the representations of the plaintiff touching the character of the plant, and that it must make investigation as to their truth or falsity. This court remarked: "It is obvious that something more than a mere inspection of an object present before a purchaser was necessary to enable the purchaser in this case to discover the truth or falsity of the plaintiff's state-

ment. Such an instruction to a jury might be appropriate in an
action in which fraud in the sale of a horse was sought to be
proved, the seller having represented the horse to be perfectly
sound, and it appearing that the horse stood before the purchaser
at the time the representation was made, and that the only defect
consisted in the absence of a leg, easily discoverable by the ordin-
ary use of eyesight, but in the case at bar the means of discovering
the truth or untruth of these false statements were not at hand in
the sense that they must have been implied before the seller might
be held responsible for his fraudulent representations; and, when
this language was used the jury must have drawn the inference
from the fact that this plant was in the same city, and might be ·
investigated with respect to its condition and its earnings and the
prices charged customers for gas and electric light, and with refer-
ence to the other features embraced in the statements made by
plaintiff on the sale; that therefore the means were at hand with-
in the rule laid down by the court requiring the purchaser to
discover at his peril the truth or falsity of the statements made.
Such a rule would be unjust and intolerable. When parties deal
at arm's length the doctrine of caveat emptor applies, but the mo-
ment that the vendor makes a false statement of fact, and the fals-
ity is not palpable to the purchaser, he has an undoubted right to
implicitly rely upon it. That would indeed be a 'strange rule of
law which, when the seller has successfully entrapped his victim by
false statements, and was called to account in a court of justice
for his deceit, would permit him to escape by urging the folly
of his dupe for not suspecting that he (the seller) was a knave.
In the absence of such a suspicion it is entirely reasonable for
one to put faith in the deliberate representations of another. The
jury must have understood that the means were at hand to dis-
cover the claim because the defendant might have measured the
wire, counted the poles, examined the gas  meters,  ascertained
how many customers were paying for gas and electric light, and
might have hired an expert to examine into the earning and ex-
penses of the plaintiff in running the plant, with a view to discover
whether a· business man had told the truth. It should have been
left to the jury to determine whether the means were at hand to dis-
cover the falsity of the statements made, in view of the character
of such statements and the nature of the property sold. The de-
fendant, as a matter of law, had a right to rely implicitly upon the

statements made by plaintiff touching the character of this plant. So long as defendant did not actually know the representations to be false, it was under no obligations to investigate to determine their truth or falsity." The court then cited numerous authorities sustaining the rule announced, and further remarked: "The unmistakable drift is toward the just doctrine that the wrongdoer cannot shield himself from liability by asking the law to condemn the credulity of his victim, and holds that the material question is whether the purchaser has in fact been deceived."

The principles announced in that case are directly applicable in the case at bar, and render further citation of authorities unnecessary on this point. We may, however, say that there are numerous authorities holding to the general principle that expressions of opinion as to value do not constitute actionable representations when false; but, as we read the evidence in this case, and notice the relative position and knowledge of the parties and all the surrounding circumstances, it is clear to us that it does not come under the general rule, but rather under exceptions to that rule. The complaint only stated express misrepresentations. We think the allegations are sustained by the evidence, as before indicated, but this conclusion is greatly strengthened by the fact that the record discloses, not only express representations which were fraudulent, but suppression of the truth. The evidence of these is properly considered in determining the effect of the express representations. We think the case may be stated thus: The vendor was familiar with the nature and condition of the assets of the corporation and of their value. He knew whether or not it was solvent and in condition to do profitable business. He knew the motive prompting the vendee to make the exchange. He knew Liland's ignorance of business in general, and that it was impossible for him to ascertain by independent effort the condition of the corporation and the value of the stock. He sold to him for a sound price his stock in the corporation knowing it to be insolvent, and not in condition to do a profitable business and without disclosing to Liland the true condition. We thus have a sale for a sound price of an article containing a latent defect known to the vendor, which could not be ascertained by the vendee, for a particular purpose known to the vendor, and for which purpose the article was unfit. This alone would render the transaction fraudulent. It amounts to a concealment of latent defects under circum-

stances which imposed a duty upon the vendor to disclose such defects. When to this is added the further fact that representations were made indicating the soundness of the article, the fraud is all the more apparent.

In Paddock v. Strowbridge, 29 Vt. 470, the court states this principle thus: "There is no positive duty in the vendor to disclose defects in the article, but if he conceals them, even by silence, when he knews the other party has fallen into a delusion in regard to them, and is making a purchase which he otherwise would not make, or at a price materially beyond what he otherwise would pay, in consequence of such delusion, this is equivalent to a false representation or to the use of artifice to disguise the defects of the article." The plaintiff purchased an article for a certain purpose known to the defendant. It was unsuitable for that purpose, and the defendant knew this fact. Defendant made no representations whatever as to its fitness or qualities, and did not disclose to the purchaser that the article was unfit for the purpose for which it was desired, but did nothing to conceal the defects or to mislead the purchaser, except by concealment. The court held that because the defendant knew the purpose for which the plaintiff bought the article, and that it was unsuitable for that purpose, he was guilty of fraudulent concealment of a material fact particularly within his own knowledge, which he was called upon to disclose, and, that by refraining from making the disclosure he was guilty of a suppression of the truth equivalent to a falsehood, because he knew the plaintiff made the purchase under a fatal delusion regarding the characteristic which induced its purchase.

In McAdams v. Cates, 24 Mo. 223, it was held that an action for deceit in the sale of a horse with a latent defect known to the vendor, and not to the vendee, would lie though no artifice was used or representations were made to mislead the vendee. The court says: "If he fails to disclose an intrinsic circumstance that is vital to the contract, knowing that the other party is acting on the presumption that no such fact exists, it would seem to be quite as much a fraud as if he had expressly denied it, or asserted the reverse, or used any artifice to conceal it, or to call off the buyer's attention from it."

In Howard v. Gould, 28 Vt. 523, 67 Am. Dec. 728, a statement of another variation of this principle is made. The plaintiff purchased of defendant a horse affected with glanders. The defend-

ant knew the horse had the disease, and told the plaintiff the horse was sick and not fit to use, and, in reply to a question as to what was the matter, said the animal had horse distemper of the worst kind he supposed, but that plaintiff might examine him. The court, in awarding judgment to the plaintiff, said: "When the defendant undertook to answer the inquiries put to him he was bound to make a full disclosure. It is quite evident that this is a case where, to say the least, there was a fraudulent suppression of material facts, which, if they had been disclosed, would probably have prevented the trade; that the plaintiff knew the horse was diseased, and had the means of examining him, yet he had not the same means of knowing the character of the disease as the defendant had, and in this respect they cannot be said to stand upon an equality."

In Stewart v. Wyoming Cattle Ranch Co., 128 U. S. 383, 9 Sup. Ct. 101, 32 L. Ed. 439, it is said: "The gist of the action is fraud producing a false impression upon the mind of the other party, and if this result is accomplished, it is unimportant whether the means of accomplishing it are words or acts of the defendant or his concealment or suppression of material facts not equally within the knowledge or reach of the plaintiff." See, also, Marsh v. Webber, 13 Minn. 109 (Gil. 99); Rawdon v. Blatchford, 1 Sandf. Ch. (N. Y.) 344; Brown v. Gray, 51 N. C. 103, 72 Am. Dec. 563; McDonald v. Smith, 139 Mich. 211, 102 N. W. 668; People v. Peckens, 153 N. Y. 593, 47 N. E. 883; Cruess v. Fessler et al., 39 Cal. 336; Cottrill v. Krum, 100 Mo. 397, 13 S. W. 753, 18 Am. St. Rep. 549, and those parts of the note near top of page 556 and middle of page 557; National Bank v. Taylor, 5 S. D. 99, 58 N. W. 297; Waldo v. Ry. Co., 14 Wis. 576; McClellan v. Scott, 24 Wis. 81; Union Nat. Bank v. Hunt, 76 Mo. 439; Merrill v. Fla. Land & I. Co., 60 Fed. 17, 8 C. C. A. 444; Fishback v. Miller, 15 Nev. 428; Brown v. Norman, 65 Miss. 369, 4 South. 293, 7 Am. St. Rep. 663; Harvey v. Smith, 17 Ind. 272; Haygearth v. Wearing, L. R. 12 Eq. 320; 14 Am. Law Rev. 184, 185. We call particular attention to Rawdon v. Blatchford, Cruess v. Fessler, and Cottrill v. Krum, supra.

But it is said that Liland did not rely upon the representations made by Tweto. The record discloses that Tweto told Liland to make inquiry of other parties, and that before consummating the trade Liland went to one Korsvick, who had served as secretary

of the corporation, and made inquiry, and to one Hagen. Hagen told Liland to investigate the concern. Korsvick had some conversation with him, but was unable to give him any definite information. It does not appear that he made inquiry of any other parties. The inquiries which he did make of the persons named and the nature of the information, or the lack of it which he received, but emphasizes the fact already stated that he relied implicitly upon Tweto. He did not investigate. Had he done so, at least without the assistance of experts, he could have obtained no accurate information, and the information which he received from the parties named furnished no inducement to him to consummate the trade.

It is urged by respondent that a rescission should not be decreed because appellant ratified the contract, and by his own action placed the corporation in such a position as to destroy its credit and materially affect the value of the stock. Tweto remained president after he exchanged the property until the 8th day of March, 1907, when he resigned, and one Lochrem was made president. Lochrem, prior to that date, had no interest in the corporation, but had worked for it on salary. At Tweto's request he permitted Tweto to transfer to him five shares of stock, and on the ninth of the same month 200 more shares were placed in his name. We are unable to discover from the books whence these 200 shares came, but the record discloses that he neither paid, nor made any agreement to pay, for it, and that it was issued to him by direction of Tweto to qualify him for directorship and the presidency. Liland had been elected a director a few days before Tweto resigned as president, but had taken no active part in the management of the corporate affairs until a meeting of the directors held on March 8th, when Lochrem was elected president, and at which no other business was transacted. It appears that among the liabilities of the corporation were bills payable in large amount, due the different banks in which Tweto was interested, and that four days after the exchange was consummated between Tweto and Liland, Tweto, as president, and the secretary of the corporation executed chattel mortgages on all the personal property belonging to it to these different banks to secure such indebtedness, and that this was done without authority from the board of directors. But for Tweto's knowledge of the rottenness of affairs, can it be said he would have given these mortgages? We think not. These chattel mort-

gages were not filed with the register of deeds until the 11th day of March, 1907, three days after Tweto's resignation as president. Chattel mortgages were also given about the same time to other parties, but not filed until after Tweto resigned. These mortgages, together with those previously existing on the real estate, created liens upon all the property of every description, including all the stock of merchandise owned by the corporation. Their filing resulted in a number of foreign creditors at once taking steps to secure their indebtedness. A committee of such creditors visited Abercrombie. A meeting of the directors was held on the 14th day of March, 1907, for the purpose of considering the best method of procedure. The committee was present, and demanded the execution and delivery of a trust deed to secure the creditors. The board of directors asked a few days in which to consider it. This was refused by the committee, whereupon a resolution was passed by the board that the property, both real and personal of the company be conveyed to G. H. Korsvik, I. H. Lochrem, and E. B. Edgar as trustees, for the benefit of its creditors, and thereupon such a deed was executed and delivered. A part of the creditors appeared to have refused to concur in this transaction. This resulted in proceedings being instituted in the federal court to have the corporation adjudged bankrupt, and a receiver was appointed of its property by the bankruptcy court. Thereupon both Tweto and the corporation secured counsel, and submitted an application for the dissolution of the receivership and the discharge of the receiver. A hearing was had on this application by the judge of the United States court, at which an attempt was made by Tweto to show the solvency of the corporation, and that the affidavits submitted by creditors were untrue. The court denied the application and continued the receivership, whereupon Tweto effected a compromise with the creditors and took assignments of all the claims of the hostile creditors, agreeing to pay in installments 55 cents on the dollar for their claims. This agreement was subsequently modified by their accepting 50 cents on the dollar in cash, and the claims were transferred to Tweto personally.

The contention is that the participation of Liland as a director in the meeting which resulted in the execution of the trust deed was a ratification of the exchange of property for the shares of stock. There may be no doubt that had he done this with full knowledge of the condition of the company, it would have ef-

fected such ratification, but from what we have said, based upon the record, as to the condition of the company's affairs and Liland's ignorance of business methods and inability to examine the books, as well as the fact that the books failed to disclose the condition, it is apparent that he could not have been fully advised at that time of the company's condition. An unexpected emergency arose; the creditors were insistent. The immediate occasion of this emergency was Tweto's action in placing upon record the chattel mortgages. The board was compelled to accede to the request of the creditors or face bankruptcy proceedings; and, in view of the fact that Liland did not have full knowledge of conditions when he thus acted, and of the emergency and the duty which would devolve upon the board to protect the property of the corporation of which they were directors, irrespective of the ownership of the stock, we are satisfied that Liland's act was not intended to be, and does not in law constitute, a ratification of the exchange. He held stock which qualified him for the directorship independently of his purchase from Tweto. He rescinded on acquiring full information of affairs and his right to rescind. The rule that impossibility of restitution is a defense, as claimed by respondent, does not apply when complete restitution to status quo has been rendered impossible by the act of the defendant. 24 Am. & Eng. Enc. Law, 623. The burden of proving knowledge of the facts giving rise to the right to rescind and of the time of acquiring such knowledge rests on the defendant. 24 Am. & Eng. Enc. Law, 626. We are likewise satisfied that certain conversations between him and the cashier of one of Tweto's banks at a subsequent date, regarding the purchase by the cashier of Liland's stock, did not constitute a ratification. The most that can be said of it was that Liland and Johnson, the cashier, had some conversation with reference to a sale and purchase of this stock, and that Liland made no proposition of sale. Johnson made an offer to buy, which was not accepted.

In addition to what we have heretofore said in regard to the condition of affairs, we may add that an inspection of the books of the corporation before us as exhibits fails to disclose when the bills payable existing at the time of the transaction in question matured; at least we have found no entries giving that information. The absence of such information in the books only emphasizes the impossibility of Liland determining, from any inspection which

he might make, or cause to be made, the true condition of the assets and liabilities.

It is also said that the corporation sold and acquired property after the 15th day of February, 1906, which materially changed its condition. We are not aware that Liland had anything to do with these transactions further than they related to the trust deed; but, even if he did participate in them, they consisted in the purchase and sale, and the payment of indebtedness in the ordinary course of their business, and did not materially change the condition of the corporation financially. If debts were paid with money, such payment decreased the liabilities and the assets at the same time. If goods were purchased on credit, the increase in liabilities was offset by an increase in assets, and no showing is made that extraordinary indebtedness was incurred which materially affected the ability of the corporation to meet its obligations; on the contrary, as far as we are able to ascertain, if any change occurred, it consisted in some reduction in its libilities. The fact that Tweto has disposed of personal property which he acquired from Liland does not mitigate against a judgment in favor of appellant or affect the equities. There is no material controversy as to the value of such property. The trial court can easily take an account of the same, and strike a balance between it and the amounts paid by Tweto on the indebtedness against the farm, and enter judgment in favor of the proper party for the difference.

The judgment in favor of defendant is reversed, and the district court is directed to enter judgment directing a transfer of the stock and the land to the respective parties, and to take an accounting as prayed for in plaintiff's complaint. All concur.